[L.A. Nos. 29578, 29579. In Bank. June 18, 1969.]

C. DeFOREST CUTLER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Robert M. Newell and Newell & Chester for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California in L.A. 29579 that petitioner be suspended from the practice of law for three years and its recommendation in L.A. 29578 that he be disbarred.

*Questions*: First. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* The burden is upon one seeking review of a recommendation of a disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*McKinney* v. *State Bar*, 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425].) In the present case, petitioner has not sustained this burden.

The two matters herein reviewed were heard by different trial committees, each proceeding independently of the other. They were argued before the disciplinary board at the same time, but the board acted separately on each proceeding as if each were an isolated case. It is appropriate, however, for this court to consider the two matters together even though there has been no formal consolidation of records. (See *Resner* v. *State Bar,* 53 Cal.2d 605, 613 [4] [2 Cal.Rptr. 461, 349 P.2d 67].)

 The undisputed disciplinary board findings in L.A.

29579 show that during July 1965, while representing the executor of an estate, petitioner caused the executor to deliver into his possession and control $34,684.81 cash belonging to the estate; that upon receipt thereof petitioner deposited said funds into a bank account which was designated a "trust account," but which was not maintained by petitioner as such[1] (which account will hereinafter be referred to as petitioner's "personal trust account"), and commingled the trust funds with his own funds; that thereafter, without the knowledge of the executor or the probate court, petitioner converted and appropriated $12,500 of said estate funds to his own use and $16,000 to the use of his relatives and third parties; that he wilfully and for his own gain delayed closing the estate more than six months after final distribution was ordered in July 1965; that he issued four distribution checks, each for $10,000 or more, none of which were honored (but all of which petitioner subsequently made good, in three instances after an interview with a representative of the district attorney); and that in another estate matter with the same person as executor, petitioner caused the executor to place most of the estate's cash in petitioner's control, and then, between October 1962 and July 1966, with the executor's permission, but without the probate court's permission, lent approximately $6,000 of the estate funds to other clients of his.

Petitioner does not question the above findings, but urges that a three-year suspension is "somewhat harsh" and requests that this court review L.A. 29579 and L.A. 29578 together and "if it finds that disbarment in [L.A. 29578] was too harsh a result, that it . . . order any suspension of the Petitioner [in L.A. 29579] be concurrent."

In L.A. 29578, the record shows that in the latter part of 1962 Gudrun Seyfang, a 26-year-old German girl, who attended Huntsville University in Texas, was seriously injured in a railroad crossing accident near Visalia, California. In March 1963, her father, Dr. Rolf Seyfang, of Stuttgart, Germany, authorized petitioner to act for her in a claim for dam-

---

[1] In the words of the local administrative committee, the account was used as "a 'Revolving Loan Account' for making loans to relatives of [petitioner], third persons, and to [petitioner]," rather than as a clients' trust account. The evidence discloses that, commencing as early as 1962 if not sooner, petitioner used moneys from this account to make personal loans. He said that he deposited therein moneys received from clients and others which he could personally use for loans, but that he did not maintain any records of account concerning the moneys he deposited in the account, withdrew from it, or lent from it.

ages on a contingent fee basis. On April 6, 1963, Miss Seyfang, who had been transferred by her doctor to Texas, signed a retainer agreement on the terms authorized by her father, that is 33⅓ percent if settled before trial or 40 percent if settled afterwards. One of Miss Seyfang's brothers from Germany was in Texas with her at the time she signed the agreement, and he later took her back to Germany.

Thereafter, an action was filed in behalf of Miss Seyfang against the Atchison, Topeka, and Santa Fe Railroad Company. In November 1964, the railroad offered to settle it for $140,000. On December 4, 1964, petitioner flew to Germany to discuss the proposed settlement with Miss Seyfang and her family, who were caring for her. Petitioner took with him a release agreement prepared by the railroad's attorneys and a Title Insurance and Trust Company General Power of Attorney form. The railroad did not require petitioner to obtain a power of attorney, but one of Miss Seyfang's brothers testified that petitioner explained to them that it was needed so that he could sign Miss Seyfang's name to the settlement draft, obtain his fee, pay her medical expenses, and forward her share of the proceeds to her in Germany, thus saving them the trouble of having the whole sum sent to Germany first and then having to send back to the United States the amount of Miss Seyfang's unpaid bills and his fee.

Petitioner testified that it was his impression that he could have negotiated the settlement draft with a special power of attorney, but that if he was going to invest Miss Seyfang's money, he would have to have a general power of attorney. He further said that although prior to going to Germany in December 1964 he had not discussed the possibility that he would invest any of the settlement proceeds on behalf of Miss Seyfang, he nevertheless took with him to Germany only a general power of attorney form.

Petitioner testified that before going to Germany he suggested over the telephone to one of Miss Seyfang's brothers that he should be thinking about what Miss Seyfang would want to do with her funds. He further testified that he informed Miss Seyfang at the time she signed the power of attorney that he would have full authority under it to utilize the funds in his discretion for her best interest, and that she said, "I have trusted you from the beginning, Mr. Cutler, I still trust you now, and I will execute this on that basis that you will serve my best interests."

One of Miss Seyfang's brothers testified that while peti-

tioner was in Germany, he indicated he could invest the funds very profitably for Miss Seyfang in a California firm, but said he would send a report on his investigations and wait for precise instructions what to do with the funds and would never do anything with them that would not be for her benefit. The brother further testified that both he and his father informed petitioner that any investment in the United States was out and that after receiving the money and paying Miss Seyfang's medical expenses and taking out his fees, he should immediately send the money to Germany. Petitioner, according to the brother's testimony, thereupon assured the Seyfangs that he would never do anything without Miss Seyfang's personal consent or instruction.

Petitioner said that he did not "think" any of the Seyfangs had given him any clear-cut instructions at the time he was in Germany for the signing of the release and the power of attorney.

At the time petitioner made the trip to Germany in December 1964, he was financially interested in two Delaware corporations formed in 1962, Electron Industries, Inc. (hereinafter referred to as "Electron") and Freeze-Aire International, Inc. (hereinafter referred to as "Freeze-Aire"). The two corporations were of a speculative nature and were involved in developing new products.[2]

In April 1963, petitioner had met Leo C. Popkin, president, general manager, and principal stockholder of the two corporations, and the following year they became close friends. They discussed the possibility of petitioner's eventually obtaining some of Popkin's stock in the corporations, and in July 1964 entered into an oral "Gentlemen's agreement" that petitioner would lend the corporations $100,000. Under their agreement, loans would be made as required by the operations of the corporations, would be for three years, bear interest at 7 percent payable at maturity, and would not be secured. As of December 2, 1964, petitioner had lent the corporations the sum of at least $38,000, part of which he had obtained as loans from two banks. Between December 24, 1964, and January 26, 1965, he lent the corporations, or paid for their account, an additional $60,000. Petitioner made the loans to the corporations without asking for, or receiving, any promissory notes, security, or other evidence of indebtedness by Popkin or the corporations.

[2] Electron was formed to manufacture and sell portable alternators and starting units, and Freeze-Aire was formed to manufacture and sell modulary refrigeration units utilizing thermal electricity.

Some time before December 11, 1964, petitioner entered into an oral agreement with Mr. Leon E. Heifetz, one of Electron's three stockholders, to purchase Mr. Heifetz' stock in the corporation. The agreement, requiring payment by petitioner of $37,500 for the stock, was reduced to writing on December 11, 1964.

Prior to December 1964, petitioner had investigated both corporations and obtained reports from a firm of accountants he had hired, from which it clearly appeared that the corporations were of a highly speculative nature, lacked adequate capitalization, and were in a critical financial position.[3]

On December 24, 1964, petitioner received a draft for $140,000 in settlement of Miss Seyfang's case. He deposited it in a commercial bank account maintained in the name of Watson and Cutler and used for the payment of general office expenses and salaries.[4] Checks for attorney's fees totaling $45,000 ($30,000 to petitioner and $15,000 to Mr. Watson) were immediately drawn, leaving in the general office account around $95,000 of the $140,000 settlement. Of that amount, at least $93,000 belonged to Miss Seyfang.

Petitioner deposited the proceeds from his $30,000 fee check in his personal checking account. He immediately advanced an additional $10,000 to Electron, and by December 31, 1964, had reduced the balance in his personal checking account to $5,318.48.

On December 31, 1964, petitioner wrote a check for $80,000 on the general office account, and on or about January 4, 1965, deposited it in his personal trust account (which, as hereina-

---

[3] By or before December 1964 petitioner knew the following pertinent facts concerning the corporations: (1) The accounting records of the companies were inadequate; (2) the companies were confronted with a "critical credit situation" as a result of their inability to meet payments when due; (3) there were two outstanding unsecured loans from the United California Bank, one for $100,000 made July 22, 1964, and due January 16, 1965, and the other for $7,500 made August 17, 1964, and due November 16, 1964, neither of which loans had been approved by the board of directors; (4) the sum of $3,575 was due and payable in back rent, but the lessor had agreed to a proposed payment plan contemplating that the deficiency would be made up by December 15, 1964, when the lease would be up for renewal; and that accrued unpaid interest (on the United California Bank loans and others) amounted to an estimated $25,735.

[4] Petitioner was a sole practitioner, but he practiced under the name of Watson and Cutler, using offices and equipment owned by Mr. Claude Watson, his father-in-law, and formerly used by Mr. Watson in the practice of the law. In return, he gave Mr. Watson a percentage of the net income from his practice.

bove indicated, although designated a "trust account," was not maintained as such by petitioner). The same day, he transferred $30,000 from his personal trust account to his personal checking account. That account was held jointly by petitioner and his wife and used by them to pay household and other personal expenses. Thereafter, he used funds from his personal checking account to repay bank loans (covering, in part, moneys he had borrowed to lend Freeze-Aire or Electron), to make further payments on his purchase of the Heifetz interest in Electron, and to make loans to Electron or payments on its behalf. He testified that when he made the $30,000 deposit to his personal checking account on January 4, 1965, he "credited to 'Gudrun's account' $30,000 of [his] loan [previously made] to Electron Industries." He admitted, however, that he made no record regarding the alleged credit at that time.

On January 4, 1965, petitioner wrote a check for $10,000 to Electron on his personal trust account and delivered it to Popkin, and on January 15, 1965, wrote another check to Electron on that account for $15,000 and delivered it to Popkin.[5] By March 3, 1965, there was a balance of $26.25 in petitioner's personal trust account.

Of the $15,000 from the proceeds of the settlement draft remaining in the general office account after payment of $45,000 on account of attorney's fees and transfer of $80,000 to petitioner's personal trust account, about $13,000 belonged to Miss Seyfang. By March 8, 1964, however, less than $1,200 remained in the account.

On February 23, 1965, Miss Seyfang's sister, Mrs. Jutta Seyfang Galento, who lived in Bethesda, Maryland, wired petitioner advising that Dr. Seyfang was extremely upset, because repeated inquiries made by him regarding the status of Miss Seyfang's case had not been answered. Mrs. Galento implored petitioner to send her father a cable and asked that he call her or her husband.

On March 8, 1965, Mr. Galento addressed a registered letter

[5]On a check stub for petitioner's personal trust account, a notation was made that $25,000 was paid to United California Bank for Electron's account during the latter part of January. Mr. Popkin testified that on January 26, 1965, petitioner lent the corporation an additional $25,000; and the evidence shows that on or about January 27, 1965, petitioner purchased either a cashier's check or a certified check from United California Bank in that amount for Electron's account, but that apparently it was covered by charges of $20,000 on the general office account and $5,000 on petitioner's personal checking account.

to Mr. Watson. In it, he amplified his wife's telegram and appealed for an explanation as to what had happened to Miss Seyfang's money. He mentioned that petitioner had called him on March 1 and had promised to send him a special delivery letter that same day explaining the situation, but that a week had gone by, and he had not received a letter. Mr. Galento also stated that Dr. and Mrs. Seyfang had reported to him that they had sent petitioner a letter on January 26, a telegram on February 1, and a second telegram several days later, but that as of March 3 they had not received a reply.

On March 22, 1965, Miss Seyfang sent petitioner a registered letter, in which she stated that she could not understand why he had not replied to letters and cables of January 24, February 1, and February 9, 1965. She asked, among other things, that by April 2, at the latest, petitioner cable her the entire amount due her, together with interest. She also asked that he send her at once receipts showing payment of her medical bills. In addition, she requested petitioner to send her "by return air mail" a copy of the power of attorney he had obtained from her in December 1964.

On April 5, 1965, Mr. Galento notified petitioner that since he had not followed the instructions given him by Miss Seyfang in her letter of March 22, 1965, she had revoked the power of attorney and appointed Mr. Galento as her attorney in his place. Mr. Galento asked that petitioner immediately cable to Miss Seyfang all the money due her, together with interest, and that he send Mr. Galento by air mail a full and complete accounting for the $140,000 received in the settlement. In closing, Mr. Galento advised petitioner that he was that day engaging legal counsel for Miss Seyfang in Los Angeles. By letter dated April 9, 1965, Miss Seyfang wrote petitioner confirming the revocation of the power of attorney and her appointment of Mr. Galento in petitioner's place.

Petitioner testified that early in January 1965 he wrote Miss Seyfang advising her that the settlement funds had been received and the action dismissed and that the funds had been invested, giving the dates and terms under which they had been invested. He further testified that when he received Miss Seyfang's telegram in February 1965, he wrote another letter to her. However, when asked to produce copies of such letters, petitioner was unable to do so. He sought to explain that, although it was a rare thing for him to type letters himself, he had personally typed the letters to Miss Seyfang and placed

them in a separate file marked "Personal correspondence," which had somehow disappeared.[6]

A lawsuit was filed against petitioner in Miss Seyfang's behalf by a Los Angeles law firm, and petitioner was served on April 9, 1965. A few days thereafter petitioner paid Miss Seyfang's medical expenses; and in the latter part of April 1965, he settled the lawsuit, paying Miss Seyfang the full amount due her, including interest and the expenses incurred by her to recover the money due her.

In his deposition taken a few days after the lawsuit was filed, petitioner stated that he transferred to his personal trust account the sum of $80,000 from the settlement proceeds, thereafter lent $30,000 thereof to Freeze-Aire and the remaining $50,000 to Electron, and had in his possession cancelled checks representing such loans; that he had taken promissory notes to evidence the loans; and that he had never had any ownership or beneficial interest, as opposed to a loan, in either of the two corporations.

The trial committee and the disciplinary board found that these statements were false at the time petitioner gave his deposition, that he made them at that time knowing them to be false, and that, while he had not corrected or signed the deposition, he made the statements knowing them to be false in the following respects: (a) That the sum of $30,000 of the $80,000 deposited in petitioner's personal trust account was not transferred to Freeze-Aire or Electron, but was, rather, paid by petitioner to himself by a check subsequently deposited in his personal checking account and used for his own purposes; (b) that petitioner had at no time obtained a promissory note or notes evidencing moneys allegedly lent to Freeze-Aire or Electron; and (c) that by agreement dated December 11, 1964, between petitioner and Leon Heifetz, the latter agreed to transfer to petitioner, in consideration of $37,500, all of his right, title, and interest in any stock in Electron held by him.

The record clearly supports the findings of the disciplinary board that petitioner commingled moneys belonging to his client, Miss Seyfang, failed to report his receipt of them, refused to answer inquiries from, or on behalf of, his client concerning them, and misappropriated them.

As hereinabove indicated, petitioner used three bank

---

[6]Petitioner gave at least two different accounts as to where he kept the alleged "Personal correspondence" file and offered no explanation why copies of the alleged letters were kept in such a file, while all other correspondence with Miss Seyfang was filed in the regular case files.

accounts in handling the $93,000 belonging to Miss Seyfang, none of which was an appropriate depository for trust funds as required by rule 9 of the Rules of Professional Conduct.[7] His failure to report his receipt of the money to Miss Seyfang and his failure to account to her for his use of it, despite repeated inquiries from her and her family, constituted a further violation of rule 9.

Petitioner's explanations, by which he sought to show that he had actually applied certain parts of the money for the use of Miss Seyfang, are not convincing; but, in any event, petitioner failed to make any explanation respecting the disappearance of the balance of the settlement funds. Moreover, Electron gave petitioner no notes or securities which petitioner could have assigned to Miss Seyfang, and he did not maintain any record of account for her which he could credit. As stated by this court in *Clark* v. *State Bar,* 39 Cal.2d 161, 174 [246 P.2d 1], " ' . . . The failure to keep proper books . . . is in itself a suspicious circumstance.' "

 Petitioner contends that since he had a general power of attorney from his client, he was freed from his fiduciary responsibilities to her and could use her portion of the settlement proceeds, amounting to approximately $93,000, for his own personal use. A member of the bar, however, is held to a high standard of conduct when dealing with his clients and their funds, even though not in an attorney-client relationship, particularly when the relationship has fiduciary aspects. (*Yapp* v. *State Bar,* 62 Cal.2d 809, 816 [44 Cal.Rptr. 593, 402 P.2d 361]; *Clark* v. *State Bar, supra,* 39 Cal.2d 161, 166.) Under the power of attorney, a principal-agent relationship between petitioner and Miss Seyfang was created, and petitioner became obligated to act as a trustee. (See Civ. Code, § 2322; *Rodes* v. *Shannon,* 222 Cal.App.2d 721, 725 [2] [35 Cal.Rptr. 339].) Accordingly, petitioner was a fiduciary with respect to his client and the moneys he handled for her, and he owed her the utmost good faith. (See *Schullman* v. *State Bar,* 59 Cal.2d 590, 600 [5] [30 Cal.Rptr. 834, 381 P.2d 658].)

---

[7]Rule 9 of the Rules of Professional Conduct provides: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . ."

Furthermore, an agency power must be strictly interpreted according to the written grant of power, and under the terms of the power of attorney executed by Miss Seyfang petitioner was proscribed from lending her funds without taking notes evidencing the loans. He nevertheless allegedly lent her funds to Electron or Freeze-Aire, or assigned claims for loans made by him to Electron, without asking for, or receiving, any notes or other evidences of indebtedness.

■ Where an attorney has utilized his client's funds for his own benefit, as petitioner has done here, he must meet the burden of proving that he had been freed from his professional responsibilities. Petitioner has obviously failed to meet this burden.

■ As indicated above, petitioner at the time his deposition was taken in Miss Seyfang's civil action against him made certain statements which have been shown to be false. He contends that since he had not corrected and signed the deposition, he cannot be held accountable for the admittedly false statements made by him therein. The only statements petitioner sought to "correct" before signing the deposition during the course of the State Bar proceedings were statements regarding his receipt of promissory notes.[8] He does not deny that he made the other false statements attributed to him, and from the evidence the conclusion is inescapable that he deliberately falsified his testimony to conceal the true nature of his misconduct.[9]

■ A member of the State Bar should not under any circumstances attempt to deceive another person, as petitioner here attempted to deceive the attorney his client employed to represent her in an action to recover her funds from peti-

---

[8]The following shows part of petitioner's testimony regarding his receipt of promissory notes, with his "corrected" answers in brackets: "Q. In whose name is the note? I take it it is a note by Freeze-Aire, Inc.? A. That's right. [A. There was no note.] Q. In favor of whom? A. In favor of C. DeForest Cutler, Attorney in Fact for Gudrun Seyfang. [A. There was no note.] Q. You presently have a copy of that instrument, I take it? A. That is true. [A. No.] Q. Have you recently examined that instrument? A. Not since the day that the original document was served on me in this proceeding. [A. There was no instrument.]"

[9]At the State Bar hearings, petitioner testified: "Q. Was there anything further that you want to say in explanation of the testimony which you gave at this deposition on April 19, 1965? A. Only that I regret that the statements were made as answers . . . the way they were, I knew that I could have the notes at any time that I asked for them because of my relationship to the company. I knew that at the time this deposition was taken the complete money for the repayment of this obligation to Gudrun Seyfang was already in our hands to make the payment, and that is all I can say with respect to it. I wouldn't do it again that way."

tioner, and it is immaterial whether any harm was done. (*McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196 [3].) An attorney's practice of deceit involves moral turpitude.

■ Second. *Is the degree of discipline recommended appropriate under the circumstances?*

*Yes.* The disciplinary board's recommendation of disbarment in L.A. 29578 was made without consideration of petitioner's misconduct in L.A. 29579. The board considered petitioner's misconduct in L.A 29327 (see *Cutler* v. *State Bar,* 66 Cal.2d 861 [59 Cal.Rptr. 425, 428 P.2d 289]), in which it was found that petitioner misappropriated the sum of $4,082.39 belonging to his client and between November 1965 and April 1966 used it for his personal needs and that he refused to repay the money for at least three months after his client had demanded return of the money and sued him to recover it. In that matter, petitioner was suspended for three years on conditions of probation, including actual suspension for the first six months. On May 22, 1968, he was suspended until further order, having failed to comply with certain conditions of probation with respect to reporting that he had established, and was maintaining, a proper trust account for his clients' funds and that he was correctly accounting for such funds. The fact of petitioner's violation of the terms of probation in L.A. 29327, however, was not before the disciplinary board.

Even without consideration of petitioner's violation of the terms of his probation in L.A. 29327, disbarment is clearly warranted by the circumstances here existing. (See *Resner* v. *State Bar, supra,* 53 Cal.2d 605, 614-615 [10] ; *Sturr* v. *State Bar,* 52 Cal.2d 125, 134 [6] [338 P.2d 897].) When the three disciplinary matters involving petitioner are considered together, they show that between December 1964 and May 1966 petitioner misappropriated over $120,000 in trust funds and that he repaid his clients or the beneficiaries only after they were required to resort to the courts for redress and after criminal or disciplinary investigations into his misconduct had been instituted.

■ Although petitioner has made restitution, such fact is no defense in a disciplinary proceeding. The conduct of an attorney in making his client whole, as well as the timeliness and manner of restitution, may have a bearing on discipline; but where, as here, restitution is made under the pressure of a disciplinary hearing, and there has been no prior offer of

repayment or accounting, it is entitled to no weight. (*Maggart v. State Bar,* 7 Cal.2d 495, 502 [3] [61 P.2d 451].)

Petitioner throughout his years of practice failed to maintain an appropriate clients' trust account. His conduct appears even more aggravated by his failure to report respecting his establishment and maintenance of such an account, as required by this court's order granting his probation in the first of the three proceedings to reach the court. (See *Resner* v. *State Bar, supra,* 53 Cal.2d 605, 613 [5].)

It is ordered that petitioner be disbarred and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this decision.