[L.A. No. 30423. In Bank. Jan. 27, 1976.]

DONALD H. SEGRETTI, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

[L.A. No. 30424. In Bank. Jan. 27, 1976.]

In re DONALD H. SEGRETTI on Discipline.

880

**COUNSEL**

Victor Sherman and Nasatir, Sherman & Hirsch for Petitioner.

Herbert M. Rosenthal and Stuart A. Forsyth for Respondent.

**OPINION**

**THE COURT.**—In the instant two consolidated proceedings we review a recommendation of the Disciplinary Board of the State Bar of California that Donald H. Segretti be disciplined.

Segretti, a 34-year-old attorney, was admitted to practice in 1967. In L.A. 30423 he was charged in a notice to show cause with, among other things, committing specified acts involving moral turpitude in connection with the 1972 campaign of Richard Nixon for reelection as President of the United States.

L.A. 30424 involves Segretti's conviction on two counts of violating 18 United States Code section 612 (publication or distribution of political statements)[1] and one count of violating 18 United States Code section 371 (conspiracy) by conspiring to violate section 612. In 1973 he pleaded guilty to the offenses and was sentenced to consecutive one-year prison terms, but execution of all except six months of the sentence was suspended, and he was placed on probation for three years. No appeal was filed from the judgment. After our receipt of the record of

---

[1]Section 612 provides: "Whoever willfully . . . causes to be published or distributed . . . any . . . statement relating to . . . any person who has publicly declared his intention to seek the office of President . . . of the United States . . . in a primary . . . election . . . which does not contain the names of the persons, associations, committees, or corporations responsible for the publication or distribution of the same . . . shall be" punished in a specified manner.

All references hereinafter to section 612 are to the quoted section.

conviction, we referred the matter to the State Bar for a hearing and report as to whether the facts and circumstances surrounding the offenses involved moral turpitude or other misconduct warranting discipline and, if so found, for a recommendation as to discipline.

The State Bar consolidated the two proceedings for hearing. The board determined that the facts and circumstances surrounding Segretti's conviction and apparently acts alleged in the notice to show cause and found to be true involved moral turpitude or other, misconduct warranting discipline. The board recommended that discipline be imposed but was unable to agree on the extent of the discipline.[2]

In May 1967, a few months after his admission to practice, Segretti was inducted into the Army. He served in the Judge Advocate General's Corps for over four years, including a year in Vietnam, and was honorably discharged in September 1971.

During the summer of 1971 Dwight Chapin and Gordon Strachan, who were members of President Nixon's staff and friends of Segretti, offered employment to Segretti after his Army discharge in connection with President Nixon's campaign for reelection. Chapin told Segretti that his duties would consist of pulling pranks on Democratic presidential aspirants and that the purpose of the activities was to foster a split among such aspirants so that it would be less likely that the party would unite behind the one finally receiving the nomination. Chapin also told Segretti that he should use a fictitious name when carrying out his duties in order to insulate himself from association with President Nixon's office in the event the activities came to public light. Segretti accepted the employment for a number of reasons including his favoring President Nixon's policy regarding ending the war in Vietnam. Segretti believed at that time that the mischievous acts he was to perform were in the nature of college pranks.

---

[2]Five board members recommended five years' suspension, stay of execution of such suspension, and probation for that period on conditions including three years' suspension. One board member voted against the recommendation on the ground that two rather than three years' suspension should be imposed as a condition of probation. Four board members believed Segretti should be disbarred.

The local committee recommended five years suspension, with two years' thereof suspended upon conditions relating to Segretti's passing a legal ethics course and being employed as a law clerk.

Later that summer, at the suggestion of Strachan or Chapin, Segretti met with Herbert Kalmbach, counsel to President Nixon, and Kalmbach and Segretti agreed that Segretti would work for a yearly salary of $16,000 plus expenses. Segretti thereafter in 1971 and 1972 received a total of about $45,000, including salary and expenses. At the time of his employment he felt privileged to be employed by persons connected with the White House.

After his discharge from the Army, Segretti recruited others to assist him in his new employment. He never received a clear outline of what he was to do, and he and his associates "thought up over a beer or two" a number of the acts they committed.

For several months commencing about December 1971 Segretti and others conspired to violate section 612 and committed overt acts in furtherance of the conspiracy. Also during the period from about December 1971 to June 1972 Segretti committed the two section 612 violations and engaged in other misconduct. The most serious acts committed by him were:

*Preparation and Distribution of Letters,*
*Allegedly Written by Citizens for Muskie Committee,*
*Falsely Accusing Senators Hubert Humphrey and*
*Henry Jackson of Sexual Improprieties*

Segretti, without authorization of the Citizens for Muskie Committee, wrote and caused to be distributed on the letterhead of that committee a letter accusing Senators Humphrey and Jackson of sexual improprieties. The accusations were false, as Segretti then knew. Senators Humphrey, Jackson, and Muskie were all candidates for the Democratic nomination for president.

Segretti testified that, when he wrote the letter, it was not his desire to have anyone believe the contents thereof and that instead he wanted to create confusion among the candidates. Upon later reexamination of the letter, he found it difficult to reconcile his expressed intent with the letter's contents.

The letter was Segretti's own idea. When he sent a copy to Chapin and told him it cost $20 to have the letter distributed, Chapin said that for the $20 Segretti received up to $20,000 free publicity. One of the section 612 violations and the conspiracy conviction involved this letter.[3]

---

[3]The second section 612 violation involved a card which was printed and distributed by an associate of Segretti and which urged voting for Muskie rather than Wallace.

*Preparation and Distribution of News Release on*
*Senator Humphrey's Stationery, Without His Consent,*
*Containing False Allegations Regarding Mental*
*Illness of Representative Shirley Chisholm*

Segretti wrote and caused to be distributed on Senator Humphrey's stationery, without his consent, a news release alleging that Representative Chisholm once had been committed to a mental institution and was still under psychiatric care. The allegations were false, as Segretti then knew. Representative Chisholm was also a Democratic candidate.

According to Segretti, he did not intend anyone to believe the allegations but wanted people to believe that the news release was distributed by Senator Humphrey. After Segretti sent Chapin a copy of the release, Chapin told Segretti that he laughed on reading it.

*Letters Written on Stationery of Senator Eugene*
*McCarthy, Without His Consent, Asking that*
*McCarthy and Chisholm Delegates*
*Switch Their Votes to Senator Humphrey*

In his efforts to cause dissension among the Democratic candidates, Segretti had printed on the letterhead of Senator McCarthy, another Democratic presidential candidate, without his consent, letters suggesting that McCarthy and Chisholm delegates switch their votes to Humphrey. The letters purported to be signed by a worker in the McCarthy campaign. Segretti admitted that the signature was a forgery but did not indicate who signed the letter. He had a number of the letters distributed to certain McCarthy and Chisholm delegates. Some of the letters he mailed without postage so that they would be returned to the McCarthy headquarters and persons there would be aware of the letters.

*Article in Los Angeles Newspaper Reproducing*
*Bogus Letters*

Segretti caused to be prepared and inserted in the May 26, 1972, Los Angeles Free Press a full page display, the heading of which read, "Is Mayor Yorty Involved in a Plot to Sabotage McGovern." The article contained the bogus switch vote letters hereinabove described and a letter on Mayor Yorty's campaign stationery falsely accusing Yorty of responsibility for the switch vote letters. The letter containing the false accusation was purportedly written by a disgusted Yorty supporter but was in fact Segretti's handiwork.

### False Notices Regarding Free Lunch and Drinks at Certain Headquarters of Senators Humphrey and Muskie

Segretti caused notices to be released to the effect that free lunches and drinks would be distributed at certain headquarters of Senators Humphrey and Muskie at specified times. The notices were false and were intended by Segretti to cause confusion in the campaigns of those candidates.

### Other Bogus Campaign Material

Segretti had printed and distributed other bogus campaign material. For example, he had printed and distributed (1) bumper stickers reading, "Humphrey; he started the war; don't give him another chance. Democrats for Peace Candidate" and (2) posters reading, "Help Muskie —Support Busing More Children Now. Mothers Backing Muskie Committee." No such organizations existed, as Segretti then knew.

### Miscellaneous

Segretti and an associate, ostensibly acting for Muskie organizers, ordered liquor and other items for the campaign workers. They also invited foreign guests to a Muskie fund raising dinner, provided for their delivery to the dinner by limousine, and hired a magician to entertain. The purpose of their actions was to cause confusion at the Muskie dinner.

Segretti collaborated with an associate regarding placing of stink bombs at a Muskie picnic and at Muskie headquarters. Segretti was later told that a stink bomb had been placed in Muskie's headquarters but did not know who placed it there.

The findings of the board and local committee set forth many of the above recited facts.

### Immunity Issue

Segretti contends that his privilege against self-incrimination was violated when his immunized testimony was used at the State Bar proceedings. Transcripts of his testimony before the United States Senate's Select Committee on Presidential Campaign Activities (here-

after called the Senate Watergate Committee) and at the trial in a criminal action against Dwight Chapin constituted a major part of the State Bar's evidence. Segretti testified before the Senate Watergate Committee pursuant to a court order directing him to do so and extending him immunity as provided in 18 United States Code section 6002.[4] He also testified at the Chapin trial under a grant of immunity, and from counsels' remarks it appears that such immunity was likewise granted under section 6002.

■ The Fifth Amendment of the federal Constitution provides that "No person . . . shall be compelled in *any criminal case* to be a witness against himself . . . ." (Italics added.) This provision is made applicable to the states by the Fourteenth Amendment. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 658-659, 84 S.Ct. 1489].) Article I, section 15, of the California Constitution contains a substantially identical provision.

The privilege "can be asserted in any proceeding civil or criminal, administrative or judicial, investigatory or adjudicatory; [fn. omitted] and it protects against any disclosures that the witness reasonably believes could be used *in a criminal prosecution* or could lead to other evidence that might be so used." (Italics added.) (*Kastigar* v. *United States, supra,* 406 U.S. 441, 444-445 [32 L.Ed.2d 212, 216-217].) One facet of the privilege is that the "[g]overnment may not permit the use in *a criminal trial* of self incriminating statements elicited by compulsion." (Italics added.) (See *Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 57, fn. 6 [12 L.Ed.2d 678, 683, 84 S.Ct. 1594].)

■ The purpose of disciplinary proceedings against attorneys is not to punish but rather to protect the court and public from the official ministrations of persons unfit to practice. (See, e.g., *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 225 [113 Cal.Rptr. 175, 520 P.2d 991]; *Black* v. *State Bar* (1972) 7 Cal.3d 676, 686, 688 [103 Cal.Rptr. 288, 499 P.2d 968]; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325].) Such a proceeding is not a criminal case for purposes of the Fifth Amendment privilege against self-incrimination. (*Black* v. *State Bar,*

---

[4]Section 6002 provides that when a witness is compelled by court order to testify over a claim of the privilege against self-incrimination, "the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in *any criminal case*" except specified prosecutions. (Italics added.) The immunity granted by section 6002 is coextensive with the Fifth Amendment privilege against self-incrimination. (*Kastigar* v. *United States* (1972) 406 U.S. 441, 448 et seq. [32 L.Ed.2d 212, 219, 92 S.Ct. 1653].)

*supra,* at pp. 686-688; *In re Schwarz* (1972) 5 Ill.2d 334 [282 N.E.2d 689, 691] [cert. den., 409 U.S. 1047 (34 L.Ed.2d 499, 93 S.Ct. 527), rehg. den., 410 U.S. 947 (35 L.Ed.2d 281, 93 S.Ct. 959)]; *Maryland State Bar Association, Inc.* v. *Sugarman* (1974) 273 Md. 306 [329 A.2d 1, 7] [cert. den., 420 U.S. 974 (43 L.Ed.2d 654, 95 S.Ct. 1397)]; *Zuckerman* v. *Greason* (1967) 20 N.Y.2d 430 [285 N.Y.S.2d 1, 231 N.E.2d 718, 721] [cert. den., 390 U.S. 925 (19 L.Ed.2d 985, 88 S.Ct. 856), rehg. den., 390 U.S. 975 (19 L.Ed.2d 1196, 88 S.Ct. 1031)]; *Committee on Legal Eth. of W. Va. St. Bar* v. *Graziani* (W.Va. 1973) 200 S.E.2d 353, 354-357, 62 A.L.R.3d 1138 [cert. den., 416 U.S. 995 (40 L.Ed.2d 774, 94 S.Ct. 2410)]; cf. *In re Rouss* (1917) 221 N.Y. 81 [116 N.E. 782, 784]). Thus that privilege was not violated by the use at the instant proceedings of testimony given by Segretti under grants of immunity. (*In re Schwarz, supra; Maryland State Bar Association, Inc.* v. *Sugarman, supra; Committee on Legal Eth. of W. Va. St. Bar* v. *Graziani, supra; In re Klebanoff* (1968) 21 N.Y.2d 920 [289 N.Y.S.2d 755, 237 N.E.2d 75] [cert. den., 393 U.S. 840 (21 L.Ed.2d 110, 89 S.Ct. 118)]; cf. *Napolitano* v. *Ward* (7th Cir. 1972) 457 F.2d 279, 282-284 [cert. den., 409 U.S. 1037 (34 L.Ed.2d 486, 93 S.Ct. 512), rehg. den., 410 U.S. 947 (35 L.Ed.2d 616, 93 S.Ct. 1351)]; see annot. (1975) 62 A.L.R.3d 1145, 1147-1148, 1151-1152.)

*Spevack* v. *Klein* (1967) 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct. 625], cited by Segretti, does not aid him. *Spevack* held that an attorney may not be disbarred for claiming his privilege against self-incrimination. As we noted in *Black* v. *State Bar, supra,* 7 Cal.3d 676, 687, "Although *Spevack* suggests to at least one commentator that the United States Supreme Court would now regard a disciplinary proceeding as criminal for purposes of the Fifth Amendment privilege against self-incrimination [citation], courts and other commentators have expressly or impliedly rejected that view [citations]." (See also *In re Schwarz, supra,* 282 N.E.2d 689, 691; *Maryland State Bar Association, Inc.* v. *Sugarman, supra,* 329 A.2d 1, 3-4, 7; *Committee on Legal Eth. of W. Va. St. Bar* v. *Graziani, supra,* 200 S.E.2d 353, 356; annot., *supra,* 62 A.L.R.3d 1145, 1148.)

### Claim That Segretti's Acts Did Not Involve Moral Turpitude

There is no merit to a contention by Segretti that his acts did not involve moral turpitude. As above appears, he repeatedly committed acts of deceit designed to subvert the free electoral process. Even if credence were given to his dubious claim that he did not intend the recipients to believe the allegations of some of the material in question, he admittedly

intended the recipients to be deceived as to the source of the material. A member of the bar should not under any circumstances attempt to deceive another. (See *Cutler* v. *State Bar* (1969) 71 Cal.2d 241, 252-253 [78 Cal.Rptr. 172, 455 P.2d 108]; *McKinney* v. *State Bar* (1964) 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425].) ■ "An attorney's practice of deceit involves moral turpitude." (*Cutler* v. *State Bar, supra;* in accord, *Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 713 [108 Cal.Rptr. 821, 511 P.2d 1173].)

## Discipline

■ Segretti, as we have seen, engaged in gross misconduct over a period of several months.

There are, however, a number of mitigating circumstances. Segretti has no prior disciplinary record. (E.g., *In re Kreamer* (1975) 14 Cal.3d 524, 531 [121 Cal.Rptr. 600, 535 P.2d 728]; *Mrakich* v. *State Bar* (1973) 8 Cal.3d 896, 907 [106 Cal.Rptr. 497, 506 P.2d 633].) During the period of over four years he was in the Judge Advocate General's Corps he displayed honesty and trustworthiness and performed his legal duties in an outstanding manner. (*In re Jones* (1971) 5 Cal.3d 390, 400 [96 Cal.Rptr. 448, 487 P.2d 1016].) He was only 30 years old at the time of the misconduct (*Crawford* v. *State Bar* (1960) 54 Cal.2d 659, 669 [7 Cal.Rptr. 746, 355 P.2d 490]) and thought he was acting under "the umbrella of the White House." It is important to note that the misconduct was not committed in his capacity as an attorney. (*In re Kreamer, supra,* 14 Cal.3d 524, 531.) After he committed the improper acts, he recognized their wrongfulness, expressed regret, and cooperated with the investigating agencies.[5] (*In re Cohen* (1974) 11 Cal.3d 935, 943

---

[5]For example, at the Senate Watergate Committee hearing Segretti testified that "my activities were wrong and have no place in the American Political System. To the extent the activities have harmed other persons and the political process, I have the deepest regret."

Leon Jaworski, special prosecutor with the Watergate Special Prosecution Force, wrote ". . . Very early in our office's investigation of this matter . . . Segretti agreed to supply us with any information and cooperate fully with our efforts. Since that time we have interviewed him on various occasions, he has testified in the grand jury and was a government witness in the perjury prosecution of . . . Chapin. In all his appearances we believe that . . . Segretti has been totally truthful and candid both as to the relevant facts and his feelings of remorse for his involvement."

The State Bar points to matters such as that Segretti testified at the instant hearings that he would not have testified before the Senate Watergate Committee or at the Chapin trial had he not been granted use immunity. The fact remains, however, that he did cooperate with the investigating agencies, as both the local committee and the board found.

[114 Cal.Rptr. 611, 523 P.2d 651]; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) He has already " 'suffered the ignominy of a criminal conviction [and] has served time in a [federal] penal institution . . . .' " (*In re Kreamer, supra,* 14 Cal.3d 524, 532, quoting from *In re Jones, supra,* 5 Cal.3d 390, 401.) He voluntarily abstained from the practice of law during the instant proceedings (*Demain* v. *State Bar* (1970) 3 Cal.3d 381, 387 [90 Cal.Rptr. 420, 475 P.2d 652]), and although he has been a member of the State Bar for some eight years, he has not yet practiced as an attorney except for the period he was in the Judge Advocate General's Corps.

The local committee, as above appears (see fn. 2, *ante*) recommended suspension rather than disbarment, and its recommendation is entitled to great weight (*In re Cohen, supra,* 11 Cal.3d 935, 944). Although the board was unable to agree on the extent of discipline, a majority of the board members who voted recommended suspension rather than disbarment.

The local committee also proposed that as a condition of the stay of one year of the recommended suspension Segretti be required to take and pass a course in legal ethics in a California law school and thereafter furnish the State Bar with a statement by the instructor affirming that Segretti fully understands the contents of such course. The board did not adopt this recommendation and, as we have seen, was unable to agree on the extent of the discipline. Five board members recommended as a condition of probation that Segretti be required to certify in his first quarterly report to the State Bar that since the effective date of his probation he has "read" the State Bar Act and the Rules of Professional Conduct of the State Bar.[6]

To compel Segretti to take and pass an entire law school course in ethics could create serious practical problems and impose an undue burden on him. Furthermore, under the local committee's recommendations Segretti could eventually resume practice even if he never took or passed such a course. On the other hand to permit him simply to certify that he has "read" the rules of conduct would not insure that he has understood them, or that he can correctly apply their principles to the variety of ethical quandaries in which a practicing lawyer may find himself.

[6]The State Bar routinely recommends this requirement as a condition of probation. (See, e.g., *In re Cohen, supra,* 11 Cal.3d 935, 944-945.)

We now have available, however, a convenient and effective method of achieving the foregoing goals. Since February 1975 the Committee of Bar Examiners has administered a Professional Responsibility Examination as a distinct part of the general bar examination and the attorneys' examination. In this test hypothetical fact situations are given illustrating different dilemmas of legal ethics, and the examinee is asked to select the proper course of conduct from among several proposed alternatives. The examination is given four times a year,[7] and must be taken by all prospective new attorneys and all out-of-state attorney applicants. No such person who fails the examination will be certified for admission to practice law in this state. (Rules Regulating Admission to Practice Law (as amended Sept. 1, 1975), rules XI and XII, 3B West's Ann. Bus. & Prof. Code (1974 ed., 1976 Cum.Supp.) foll. § 6068 at pp. 27-29 [Deerings, Rules Regulating Admission to Practice Law, rules XI and XII].)

In addition, upon request of the State Bar we have recently adopted an amendment to California Rules of Court rule 952(d), effective January 1, 1976, relating to applications for readmission or reinstatement by former members of the bar who have been disbarred or have resigned with prejudice. New rule 952(d) requires all such applicants not only to establish their present moral fitness and knowledge of the law, but also to take and pass the Professional Responsibility Examination. In its letter of transmittal to this court the State Bar explained that the latter require-ment, now imposed on all persons seeking admission to the California bar for the first time, becomes "even more essential" in the case of individuals who, once admitted, have demonstrated by their misconduct their failure to live up to the ethical standards of the profession.

We are of the view that the same reasoning applies to all members of the bar whose behavior has so far deviated from ethical norms as to warrant the serious step of suspension from practice. The functions of the Professional Responsibility Examination, according to the 1975 Annual Report of the Board of Governors of the State Bar, are to require prospective attorneys "to familiarize themselves with the ethical stan-dards of the profession and the Rules of Professional Conduct, to raise their sensitivity to the presence of ethical questions when they arise, and to learn how to apply the rules in situations arising in practice." (50 State Bar J. (1975) 422, 427.) These accomplishments equally serve the purpose of a disciplinary proceeding, which is designed to rehabilitate

---

[7] It is given once in conjunction with each of the two annual general bar examinations and once not less than 30 nor more than 90 days thereafter.

rather than penalize. Even in cases such as the present, in which the ground of discipline is not a violation of a specific section of the Rules of Professional Conduct, the examination will cause the erring member of the bar to reevaluate and reflect upon the moral standards of the profession, and thereby more deeply appreciate his responsibilities to society as a whole. In short, although we cannot insure that any attorney will in fact behave ethically, we can at least be certain that he is fully aware of what his ethical duties are.

Because punishment is not our purpose in requiring suspended attorneys to pass the Professional Responsibility Examination, no such attorney will be excused from the requirement on the ground that his misdeed was minimal and his discipline light. Rather, after the effective date of this decision each member of the bar whose conduct results in suspension from practice by order of this court will be required, as a condition of resuming or continuing practice, to demonstrate that he knows, understands, and can apply the principles of legal ethics by passing the Professional Responsibility Examination. If, as here, the order of suspension is stayed and the attorney placed on probation, the requirement that he pass the Professional Responsibility Examination will be one of the conditions of that probation, whether or not actual suspension is also a condition thereof. This requirement will thus replace in each case the previously prescribed condition (*ante,* fn. 6) that he "read" the State Bar Act and Rules of Professional Conduct.[8]

For these reasons it is ordered that Segretti be suspended from the practice of law for five years; that execution of such suspension be stayed; and that he be placed on probation for that period upon condition that he shall be suspended from the practice of law for the first two years thereof and that he comply with the conditions of probation recommended in the resolution of the board of November 9, 1974 (which

---

[8]We recognize that both prospective new attorneys and out-of-state attorney applicants have several opportunities to pass the Professional Responsibility Examination. In fairness, suspended attorneys should have the same opportunities. Accordingly, in a case such as the present, in which the attorney is suspended for one year or more, he must pass the examination at any time prior to the end of his period of suspension; but if he is suspended for less than one year (e.g., 30 days or 6 months), he will be accorded one year in which to pass the examination. In either case, however, if the attorney does not succeed in passing the examination within the time prescribed, upon our receipt of notice from the State Bar that he has not passed any examination within that time he will automatically be placed on actual suspension until he does pass the examination and we receive notice thereof.

was not adopted)[9] except that the period of actual suspension will be as herein specified and Segretti will not be required to certify in his first quarterly report to the State Bar that he has read the State Bar Act and the Rules of Professional Conduct; in lieu of that requirement, we further order as a condition of probation that prior to the end of Segretti's period of actual suspension he pass the Professional Responsibility Examination. This order is effective 30 days after the filing of this opinion.

---

[9]The conditions stated in the above resolution include three years' suspension, compliance with the State Bar Act and Rules of Professional Conduct, filing reports with the State Bar certifying to specified matters, and, except to the extent prohibited by specified privileges, answering inquiries by board representatives relating to compliance with the terms of probation.