[No. H015871. Sixth Dist. Dec. 30, 2008.]

In re MARK DANIEL GRUNAU on Habeas Corpus.

## COUNSEL

Paul Couenhoven, under appointment by the Court of Appeal, for Petitioner Mark Daniel Grunau.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Christina Vom Saal, Deputy Attorneys General, for Respondent State of California.

## OPINION

**RUSHING, P. J.**—Defendant Mark Daniel Grunau seeks recall of the remittitur in this matter on the ground that the 1997 dismissal of his appeal resulted from neglect and misconduct by his appellate attorney, and that relief was not sought sooner because that attorney consistently and plausibly misrepresented the status of the case to defendant through defendant's father. We initially denied defendant's motion but were directed by the Supreme Court to reconsider the matter. Having done so, we are persuaded that defendant is entitled to the relief he seeks. Accordingly, we will recall the remittitur so that the appeal may be determined on the merits.

### BACKGROUND

On March 21, 1996, a jury found defendant guilty of one count of sexually abusing a minor (Pen. Code, § 647.6). The trial court sentenced him to 25 years to life under the "Three Strikes" law. Defendant's father, Dan Grunau (Mr. Grunau), retained Dan J. Foley to prosecute an appeal. Foley prepared and seasonably filed a notice of appeal, which was received by this court on September 6, 1996. He then failed to file an opening brief within the time

allowed, and disregarded a notice from this court that failure to file a brief within 15 days would result in dismissal of the appeal. (See Cal. Rules of Court, rule 8.220(a) (former rule 17(a)).) When no opening brief was filed, we dismissed the appeal on January 24, 1997. On April 4, 1997, we issued a remittitur, terminating the matter.

Defendant relied on his father to communicate with Foley regarding the appeal, in part because his own attempts to contact Foley were largely unsuccessful. Everything defendant learned about his case came from his parents. Between 1996 and 2004, Mr. Grunau called Mr. Foley monthly, sometimes weekly. In September 2002, he discovered that Foley's phone had been disconnected, but tracked Foley down by using the phonebook to find someone who knew Foley's mother. According to Mr. Grunau, Foley at no time disclosed that the appeal had been dismissed. On the contrary, from 1996 to 2004, in response to repeated inquiries, Foley consistently assured Mr. Grunau that the appeal was proceeding in due course.

Despite Foley's assurances, Mr. Grunau attempted to independently confirm that the appeal was pending by contacting the superior court. Those attempts were unsuccessful. Eventually—on August 24, 2004—Mr. Grunau contacted this court, and was told that the appeal had been dismissed. He went to the law library to research a possible remedy. He also continued to attempt to communicate with Foley regarding a possible solution. Finding none, he again telephoned this court in November and was directed by the clerk's office to contact the Sixth District Appellate Program. He did so that same month.

On March 3, 2005, through the appellate program, defendant filed a motion to recall the remittitur. In view of the inordinate lapse of time, we denied the motion. Defendant thereupon filed a petition for writ of habeas corpus in the California Supreme Court. He alleged that after taking money for the representation, Foley had, without authorization, abandoned the appeal. He further alleged that Foley had resigned from the State Bar in 2001, in the face of multiple pending disciplinary proceedings. Defendant alleged that Foley had intentionally misrepresented the status of the appeal from 1996 to 2004, repeatedly assuring defendant's family that the appeal was still pending when in fact it was not. He contended that his failure to discover the true status of his appeal was justified because of Foley's misrepresentations, and that as soon as his family actually discovered the status of the appeal in August of 2004, immediate steps were taken to reinstate the appeal.

The Supreme Court issued an order to show cause, returnable here, directing correctional officials to show cause before this court "why the remittitur . . . should not be recalled, why the order dismissing petitioner's appeal should not be vacated, and why petitioner's appeal should not be reinstated. (See *In re Serrano* (1995) 10 Cal.4th 447 [41 Cal.Rptr.2d 695, 895 P.2d 936]; *In re Martin* (1962) 58 Cal.2d 133 [23 Cal.Rptr. 167, 373 P.2d 103].)" (*In re Grunau* (order to show cause issued Aug. 15, 2007, S148025).) The state filed a return denying allegations of the petition. To resolve the resulting issues, we referred the matter to a special master, Santa Clara Superior Court Judge Jamie Jacobs-May. We asked her to make findings of fact regarding efforts by defendant to protect his appellate rights, the nature and extent of defendant's prior experience with the appellate process, the nature of defendant's relationship with and reliance on his father, the history of his father's contacts with Attorney Foley, and the nature of Foley's conduct.

The parties appeared before the special master and, in lieu of an evidentiary hearing, presented a stipulated set of facts responsive to our inquiry. Defendant also submitted a new declaration on his own behalf. The special master, having no reason to doubt the veracity of the facts submitted, adopted them as her findings. The question presented is whether the facts thus established warrant the recall of the remittitur and the reinstatement of the appeal.

## DISCUSSION

### *Showing Required for Recall of Remittitur*

██ Remittitur is the device by which an appellate court formally communicates its judgment to the lower court, finally concluding the appeal and relinquishing jurisdiction over the matter. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 841, pp. 904–905, § 844, pp. 906–907; Code Civ. Proc., §§ 43, 912.) By recalling the remittitur, an appellate court reasserts jurisdiction on the basis that the remittitur, or more often the judgment it transmitted, was procured by some improper or defective means. Technically the court does not reclaim a jurisdiction it has lost, but disregards a relinquishment of jurisdiction that is shown to have been vitiated. (See 9 Witkin, *supra*, § 847, pp. 909–910.)

Traditionally a remittitur could be recalled only where the appellate judgment was the product of fraud (e.g., *Ellenberger v. City of Oakland* (1946) 76 Cal.App.2d 828, 830 [174 P.2d 461]), mistake (e.g., *In re Rothrock* (1939) 14 Cal.2d 34, 38–39 [92 P.2d 634]), or inadvertence (e.g., *In re McGee* (1951) 37 Cal.2d 6, 8–9 [229 P.2d 780]). More recently the remedy has been

applied to criminal cases where the appellate judgment is shown to result from the ineffective assistance of appellate counsel. (*In re Serrano, supra,* 10 Cal.4th at pp. 457, 458 (*Serrano*); *In re Martin, supra,* 58 Cal.2d at pp. 137, 139 (*Martin*).) Relief is based on the principle that "if possible, appeals should be heard and decided on the merits [citation]." (*Serrano, supra,* 10 Cal.4th at p. 458; see *Martin, supra,* 58 Cal.2d at pp. 137, 139.) In a civil case, attorney negligence may be remediable by a malpractice action, and it may be better to relegate the aggrieved litigant to that remedy than to impair the finality of appellate judgments on the ground of counsel's deficient performance. But in a criminal case, a botched appeal may result in punishment for a crime of which the defendant was convicted in error, merely because his legal representative defaulted in the performance of his professional duties. Arguably it does not lie in the state's mouth to object to relief, since it has in a sense warranted the attorney's competence by issuing him a license. (See *Martin, supra,* 58 Cal.2d at p. 139 [" 'It is a severe penalty to be inflicted on a client to deprive him of his day in court for no fault other than his reliance on the implied representation of competency made by the licensing of the attorney.' "].)

*Ineffective Assistance*

There can be no doubt that Attorney Foley rendered ineffective assistance of counsel. His conduct was significantly worse than the mere abandonment found to justify relief in *Serrano* and *Martin.* He not only failed to perform duties for which he had contracted, but affirmatively breached his fundamental duty of trust by engaging in an egregious, long-term deception intended specifically to prevent defendant from discovering his defalcations. There can be no doubt that in an otherwise proper case, his conduct would justify recall of the remittitur.

*Absence of Fault in Initial Dismissal*

To secure relief based on ineffective assistance of appellate counsel, the defendant must not himself be at fault in the original loss of his appellate rights. (*Serrano, supra,* 10 Cal.4th at p. 453, fn. 4.) He must not be to blame in bringing about the loss, and if he learns of a threatened loss of rights before it occurs, he must act with reasonable diligence to prevent it. (See *Martin, supra,* 58 Cal.2d at p. 137 ["[T]he question here is . . . whether petitioner had knowledge that his appeal was not being prosecuted and with that knowledge stood by without taking action to preserve it."].) There is no doubt that this factor is present; as in *Martin, supra,* 58 Cal.2d at page 137, defendant was "innocent of any personal fault for the dismissal of his

appeal . . . ." There is no suggestion that he had any involvement whatever in bringing the dismissal about. He did not know it was threatened, and did not learn for many years that it had occurred.

*Reliance on Family Members*

The Attorney General asserts that defendant himself did nothing to protect his appellate rights. Defendant acknowledged in his declaration that he "never requested anything be done to speed up the decision," "never made any effort to contact the [C]ourt of [A]ppeal about [his] case," and did not "ask anyone in prison for advice . . . ." He provides a partial explanation for these failures by declaring that, because of the nature of his conviction, he "specifically asked not to receive any paperwork about [his] appeal." It is obvious that he not only relied on his attorney, but also permitted his father to assume the responsibility of protecting his appellate rights.

█ We decline to hold that such reliance categorically bars a defendant from relief. Indeed, such a holding would seem at odds with *Serrano*, where the defendant's niece retained the defaulting attorney, paid him, and took responsibility for maintaining contact with him. Because the notice of appeal was filed in propria persona and counsel never made an appearance, the appellate court sent all notices directly to the defendant. When no opening brief was filed, the court dismissed the appeal. (*Serrano, supra*, 10 Cal.4th at pp. 451–453.) More than a year passed before the defendant, with the assistance of his niece, brought a motion to recall the remittitur and a petition for writ of habeas corpus. The Court of Appeal twice denied relief, concluding that the defendant had not been diligent. (*Id.* at pp. 453–454.) After making an "independent appraisal" of the circumstances, the Supreme Court reversed, holding that the equities of the case favored relief. (*Id.* at p. 457.) In finding reasonable diligence, the court relied largely on the niece's efforts, drawing no distinction between her actions and the defendant's. This treatment seems to preclude any supposition that the question of diligence must depend solely on what the defendant personally did to protect his rights. His reliance upon family members, if reasonable, will sustain the necessary finding of reasonable diligence.

To be sure, a defendant who relies on family members assumes the risk that if they do not in fact act with reasonable diligence, and his reliance on them is found unreasonable, relief will be denied. But where family members act diligently there is no reason to declare a forfeiture merely because the defendant, who after all is not only physically confined but unlikely to have

liberal access to means of communication, counted on family members for assistance. Here there is no reason to doubt that if Mr. Grunau acted diligently on defendant's behalf, defendant's reliance on him was reasonable.

Nor is there any suggestion that defendant's reliance on his father was in any sense an independent cause of appellate default or delay in seeking relief from it. There is no suggestion that defendant's personal involvement would have led to any different ends than those that actually occurred. Where a claimed lack of diligence plays no causal role in a delay in seeking relief, it cannot rationally sustain a forfeiture.

*Diligence in Discovering Dismissal*

Where the defendant's delay in seeking relief from an appellate dismissal is extensive, the reasonableness of that delay must be a factor in assessing the "equities" of the case. (*Serrano, supra,* 10 Cal.4th at p. 457.) Here the lapse of nearly eight years from the time of remittitur to the time of seeking relief distinguishes *Serrano* and *Martin,* which involved considerably shorter delays. In *Martin,* the defendant discovered the dismissal immediately upon issuance of the remittitur, began looking for help within a few months, and sought recall of the remittitur less than a year after the dismissal. (*Martin, supra,* 58 Cal.2d at pp. 136–137.) In *Serrano,* the motion to recall the remittitur was filed less than 11 months after the appeal was dismissed. (*Serrano, supra,* 10 Cal.4th at pp. 452–453; see *id.* at p. 460 (dis. opn. of George, J.).) Here the delay is eight to 10 times as great as the ones in those cases. We must decide whether this fact precludes relief.

While no arithmetic formula can determine at what point relief will be barred by delay, the elapsed time since dismissal will unquestionably gain significance as it lengthens. Jurisdictional time limits for appeals, like speedy trial rights, are predicated on a commonsense recognition that time is the enemy of witness memories and other forms of evidence. Long delays before finality can work injustice on both victims and parties. (See Pen. Code, § 1050, subd. (a); Cal. Const., art. I, § 29.) As the time between the underlying events and a hypothetical retrial increases, so does the risk of prejudice to the opposing party. Therefore, the longer the delay the greater the burden on an appellant to show a justification sufficient to overcome the prejudice.

Here it is clear that the delay is largely attributable to the reliance placed by defendant and his father on Attorney Foley, and particularly on Foley's elaborate assurances that the appeal was still pending. Defendant and his

father believed and relied on those representations. That reliance appears reasonable. This was not the too-familiar case of an attorney who simply stops communicating with his client, or who offers vacuous assurances on which, at some point, it becomes unreasonable to rely. Foley used his knowledge of the law and legal procedure not only to misrepresent the status of the appeal but to supply plausible explanations for why it remained undecided despite the lapse of years. Thus he falsely told Mr. Grunau that he had filed an opening brief and requested oral argument. He outlined six points he claimed to have raised in the appeal. As time went by, he furnished a variety of equally fictitious causes of delay in the issuance of a decision, i.e., that the case had been " 'grouped' with other Three Strikes appeals, waiting for court decisions on whether to throw out the Three Strikes [l]aw," that it "was on hold while the United States Supreme Court decided whether the Three Strikes [l]aw was constitutional," and that "the [C]ourt of [A]ppeal was short a couple of judges, which had created a backlog."

■ These statements were not implausible; indeed they were doubtless suggested to Foley by real facts.[1] The record suggests no basis to suppose that defendant or his father should have disbelieved them. The attorney is a fiduciary; his relationship to his client is one of trust. (*Cox v. Delmas* (1893) 99 Cal. 104, 123 [33 P. 836], cited in *Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 383 [193 Cal.Rptr. 422].) Because of that fact, and because attorneys are prohibited from deception, a client should reasonably be able to rely on the representations of his attorney. (*Cutler v. State Bar* (1969) 71 Cal.2d 241, 252 [78 Cal.Rptr. 172, 455 P.2d 108].) Foley never gave defendant or his father cause to doubt that they could do so. He did not disclose that he had been charged in nine disciplinary proceedings, that in 2000 he had been suspended by the State Bar, or that in 2001 he had permanently resigned from the bar with charges pending. Nor did defendant have any knowledge or prior experience of the appellate process that might have alerted him to the inordinate nature of the delay.

Moreover, Mr. Grunau did not simply accept Foley's assurances but directed repeated inquiries about the appeal directly to the superior court. That it was the wrong court to answer them reflects not a failure of diligence but an excusable ignorance of appellate procedure. Few laypersons understand in more than a nebulous way the relationship between trial and

---

[1] Indeed, had the case not been dismissed it might well have undergone some delay from those causes. During the period described, the courts did decide at least one constitutional challenge to the Three Strikes law (*Lockyer v. Andrade* (2003) 538 U.S. 63 [155 L.Ed.2d 144, 123 S.Ct. 1166]), and this court did have two judicial vacancies.

appellate courts, or that they are distinct entities. The notice of appeal, which was the only document ever filed in the matter, would have been filed not in this court but in the superior court. (See Cal. Rules of Court, rule 8.100(a)(1) (former rule 1(a)(1)).) Presumably defendant had access to some legal materials in prison, where he might have educated himself about the appellate process, but here again we return to the soothing assurances given to his father by his attorney, which could easily lull a layperson into forgoing the daunting task of attempting on his own to penetrate the esoteric world of appellate procedure.

■ We are unable to say on this record that defendant and his father showed less than reasonable diligence to protect defendant's appellate rights. Where, as here, appellate counsel engages in a campaign of plausible deceptions, the defendant (or one acting on his behalf) makes reasonable independent inquiries, and nothing else in the case—such as prior appellate experience—puts the defendant on notice that he ought not to rely on counsel's skilled assurances, even a delay of eight years before seeking relief may not bar an order recalling remittitur.

*Diligence After Discovering Dismissal*

■ Even though a defendant is blameless in the initial dismissal of his appeal, and in failing to discover the dismissal for a prolonged period, he is not entitled to recall of remittitur unless he shows that, upon learning of the cause for relief, he acted diligently to secure it. (*Talbot v. Fire etc. Pension Bd.* (1942) 51 Cal.App.2d 193, 194 [124 P.2d 352] ["Action must be taken by the moving party as soon as he learns of the facts upon which the motion is based."].) In *Martin, supra*, 58 Cal.2d at page 140, this requirement was satisfied because the defendant wrote to the court repeatedly both before and after the appeal was dismissed, and sought habeas corpus relief within six months after the remittitur issued. The court observed that the defendant " 'slept on no rights and took no chances.' " (*Ibid.*)

Here defendant's father learned of the dismissal on August 24, 2004, when he first contacted this court. For about three months he tried in vain to discover a remedy on his own. Failing in that, he again contacted this court and was referred to the appellate program. He promptly applied to that quarter for assistance—less than four months after learning of the dismissal. The motion to recall the remittitur was filed on March 3, 2005, 191 days after Mr. Grunau learned of the dismissal. We conclude that this constituted reasonable diligence.

It thus appears that defendant has shown good cause to recall the remittitur.

## Disposition

The petition for writ of habeas corpus is granted. The remittitur shall be recalled and the appeal reinstated. The clerk of this court is directed to set a briefing schedule forthwith.

Premo, J., and Elia, J., concurred.