**In Re Anonymous No. 5 D.B. 82**

Disciplinary Board Docket No. 5 D.R. 82.

*HEARING COMMITTEE,* June 27, 1983—

## STATEMENT OF THE CASE

The petition for discipline was filed January 22, 1982, and contains one charge. The petition was not based upon any "complaint" filed (Notes of Testimony [hereinafter "N.T."] 161) against respondent, but the disciplinary file was opened on motion of Disciplinary Counsel because of publicity resulting from a Federal Court trial in which respondent testified under a grant of immunity.

Basically, the petition alleged that in 1974 respondent was retained as legal counsel by Local [   ] ([   ]) of the International Brotherhood of Electrical Workers, of which respondent had been a member himself for over 15 years. At that time, [A] was Business Manager, and [B] was Vice President of Local [   ]. At about that time, construction was to begin on the [   ] building in downtown [   ]. [C] Construction Company was the General Contractor. [D] Electric Construction Company, whose President was one [E], was to perform the electrical work, and [D] subcontracted with the [F] Company to provide

labor (through Local [    ] of the electricians union), tools and supervision. After a few months, [D] became concerned about [F's] performance, particularly because of budget excesses, some of which were supposedly due to the actions at the job site of a union superintendent, [G] who, together with another foreman, was ultimately fired by [F]. The firings led to a work stoppage of the electricians and, because of power shutdowns, allegedly to stoppages by other craft unions also. [E], on behalf of [D], then allegedly met with [A], Business Manager for Local [    ], and with respondent, and ultimately it was determined that work would resume when [G] and the foreman were rehired. Problems continued, however, and the following month a meeting was held among a [D] representative, one [H], respondent, [B], and [I], President and sole owner of [J] Electric Company to discuss possible substitution of [J] Electric for [F] as the electrical sub-contractor. A subsequent meeting in Atlanta, Georgia, to discuss the same subject occurred in March, 1975, involving the above parties, plus [E]. The petition alleged that during that meeting, respondent advised [E] that [D] should be prepared to pay [J] Electric a $30,000 advance *in cash,* and that some of the money would go to [A] or [B] and that respondent's "fees would be paid." (Petition, paragraph 13). [E] allegedly told respondent at that time that a $30,000 cash payment would be impossible. However, about a week later, the [D]/[F] contract was cancelled by mutual consent and a new subcontract was signed by [D] and [J] Electric which provided, inter alia, for a "consulting fee of $30,000 payable simultaneously with the execution [of the agreement]". (Petition, paragraph 16a) Shortly thereafter, [I], President of [J], received a check from [D] for $30,000, and so ad-

vised respondent who allegedly then submitted four bills to [J] Electric for legal services, which bills, totaling $10,410, were thereupon paid. The petition further alleged that respondent informed [A] and [B] of his receipt of the $10,410, and [B] allegedly said $10,000 from [I] would be "fine" with him. [I] asked respondent to deliver the $10,000 to [B], but respondent declined and [I] paid [B] directly cash payments of $4,000 and $6,000 respectively, and so advised respondent. The petition further alleged that respondent *did,* however, in the period May through August, 1975, receive payments totaling $4,700 in cash from [I] and did deliver said money to [A]. In August, 1975, [A] was removed from office as Business Manager of Local [  ] and no further payments were made to him. The petition alleged that respondent's conduct, as outlined in the petition, was violative of 29 U.S.C. §186(a)(2), 186(a)(4), or 186(b)(1). (See Petitioner's Exhibit [hereinafter "P.E."] 5 for text of statute which prohibits generally any person acting in the interest of an employer to pay or deliver anything of value to any officers or employees of a labor organization representing the employer's employees.) Petitioner alleged the above described conduct also violated 29 U.S.C. §158(b)(6). (See P.E 5-A for text of this statute prohibiting inter alia, exacting of money from an employer for services not performed or to be performed.) The petition also alleged that respondent's conduct violated D.R. 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation, and D.R. 1-102(A)(6), dealing with conduct that adversely reflects on an attorney's fitness to practice law.

On February 25, 1982, respondent filed an answer and new matter. Said answer alleged that

respondent was retained by Local [ ] to initiate employee benefit plans; that another attorney represented Local [ ] for contract negotiations and labor disputes; that respondent had been a member of Local [ ] since 1954 and, except for two years while he was in the U.S. Army, he worked full time as an electrician while attending college and law school, from which he graduated in 1968. In that year he ceased working as an electrician, and began practicing as an attorney, although he maintained his union membership until 1977. Respondent's answer denied most of the averments in the petition for lack of knowledge or information sufficient to form a belief as to the truth thereof, and strict proof was demanded. Respondent averred in his answer that in meetings with [D] representatives he (respondent) appeared as counsel for [I] and [J] Electric, not as counsel for the Union. He admitted meeting with [E], [H], [B], and [I] in Atlanta in March, 1975, but averred he was there as counsel for [J] Electric. Respondent denied requesting from [D], on behalf of [J] Electric or [I], a $30,000 cash "advance"; denied requesting cash payment from [D]; and denied discussing with [I] distribution of the $30,000. Respondent averred that after [I] received funds from [D], he called respondent and stated he was then in a position to pay legal fees he had allegedly owed for eight years and that the respondent's law firm thereupon submitted four invoices totaling $10,410, which were thereupon paid.

In new matter, respondent averred he, [A], [B], and [I] were social friends and that he and [H] were social friends. He averred that he had represented [I] ([J] Electric) and was local counsel for [D] Electric at the time the answer was filed. He averred that the federal charges against [B] were eventu-

ally dismissed, and that the U.S. Attorney accepted a minor plea from [A]. Respondent further averred that the petition should be dismissed because Disciplinary Counsel breached the confidentiality requirements in discussing the instant matter with [E]; because respondent was granted immunity in return for his testimony in Federal court; that due process had been violated in that the petition allegedly resulted from a determination of the U.S. Attorney's Office to "get" respondent; that the alleged violations, having occurred in 1974-1975, were stale and beyond the statute of limitations (and that although Disciplinary Counsel's first letters to respondent were in April, 1980, said petition was not filed until January, 1982); and that principles of estoppel and consideration of justice dictated dismissal.

Respondent also filed a motion to dismiss the petition for discipline, a motion for production of documents and things and entry for inspection and other purposes, and interrogatories to Assistant Disciplinary Counsel [L], and briefs in support thereof.

A pre-hearing conference before the entire hearing committee was scheduled for June 3, 1982. Prior to the pre-hearing conference, Assistant Disciplinary Counsel sought leave to present witnesses at said conference to authenticate respondent's Federal court testimony. The committee declined to permit the taking of testimony at the pre-hearing conference and so advised the parties.

At the pre-hearing conference, the committee reserved decision on the matters raised in respondent's motion to dismiss because the alleged facts in support thereof were not then of record and thus properly before the committee. Assistant Disciplinary Counsel was ordered to supply respondent

with the information requested in the request for production, except for paragraph 4 thereof which requested the disciplinary file on another attorney; and the information requested in respondent's interrogatories (requesting identification of witnesses) was generally supplied except for interrogatory 5 which was objectionable in that it requested information regarding disposition of an alleged disciplinary matter involving another attorney.

The hearing was set for July 12 and 13, 1982, at which time respondent was represented by [   ], Esq. (Except in the actual hearing themselves, respondent has acted as his own counsel throughout these proceedings.) After several uncontested amendments to the petition, Assistant Disciplinary Counsel offered into evidence P.E. 1, the index or cover page of the excerpt of respondent's testimony, and the reporter's certificate page and the transcript of respondent's testimony in the Federal trial at Criminal Number 77-138, U.S.A. v. [A] and [B]. Thereupon, a series of motions to dismiss were raised by counsel for respondent, the most important one being based upon the immunity granted respondent as part of the Federal proceeding. In order to make the grant of immunity a matter of record, Assistant Disciplinary Counsel proposed to offer P.E. 1-A, consisting of a certified copy of the application on behalf of the United States seeking immunity for respondent, a letter from [   ], then Assistant Attorney General of the Criminal Division of the U.S. Department of Justice, approving said application, and an order of U.S. District Judge [   ] dated June 29, 1976, granting immunity to respondent and providing "that no testimony or other information compelled under this order (or any information directly or indirectly derived from such testimony or other information), may be used

against said witness, (naming respondent) in any criminal case except a prosecution for perjury, giving false statement, or otherwise failing to comply with this order." Petitioner's Exhibit 1-A was thereupon admitted, along with P.E. 1-B, consisting of copies of 18 U.S.C. §6002 and §6003 which are the statutory bases for grants of immunity.

Counsel for respondent, however, also called as a witness [K], Assistant U.S. Attorney, and trial counsel in the case of U.S.A. v. [A] and [B], to testify about the grant of immunity to respondent. [K] confirmed that respondent testified in the Federal trial pursuant to a grant of immunity. [K] was led through portions of pages 314 and 315 of the Federal trial transcript (P.E. 1) and agreed that the record speaks for itself and that as far as he is concerned it is accurate:

Q. [by [K] to respondent] Do you essentially understand that nothing you say in Court today can be used against you for any judicial prosecution or any judicial litigation? However, if you do not tell the truth, then you may be charged with perjury; do you understand that?

A. I understand that.

Q. That that is the only time any statement that you make could be used against you?

A. I understand that.

On cross-examination by Assistant Disciplinary Counsel, [K] testified that the statements made by him to respondent at the trial were based upon the June 29, 1976, order of Judge [   ].

After discussion among the members of the committee, consideration of the various briefs and cases cited therein, and examination of the specific grant of immunity given to respondent, the committee ruled that immunity did not preclude the

introduction in the disciplinary proceeding of respondent's prior testimony in the Federal criminal case, and P.E. 1 (respondent's testimony in the Federal case) was admitted. A discussion of the bases for the committee's ruling appears in the discussion section of this report.

Assistant Disciplinary Counsel then called [K] for direct examination to identify petitioner's exhibits 2 (a typewritten summary allegedly prepared by respondent of meetings over the work stoppage issue); 2-A (a chronology of the above mentioned 1975 events allegedly in respondent's handwriting); 2-B (an envelope bearing notations of alleged payments to [A] and dates thereof); and 2-C (four checks drawn on the account of [J] Electric and payable to respondent's then law firm)—all of which bore Government Exhibit stickers and which [K] testified were used in the course of respondent's testimony in the Federal trial (to refresh respondent's recollection) although only Exhibits 2-B and 2-C were introduced into evidence in the Federal case. Counsel for respondent objected to the admission of these exhibits, and after much discussion, the Committee initially ruled that Exhibits 2-B and 2-C were admissable because they had been admitted in the Federal case. The committee ultimately admitted P.E. 2 and 2-A also after [K], being recalled as a witness, testified at length about the origins of these documents as having come from respondent. Petitioner also introduced into evidence Exhibits 3 and 3-A, consisting of the April 23, 1980, D.B.-7 letter to respondent and respondent's answer thereto, dated April 30, 1980, and Exhibits 4 and 4-A, consisting of a May 23, 1980, follow-up letter to the D.B.-7 letter and respondent's reply thereto dated May 30, 1980.

Petitioner also introduced into evidence certain paragraphs in the Petition for Discipline and the

corresponding answers thereto. Petitioner's exhibits 5 and 5-A consisted of copies of 29 U.S.C. §186, which inter alia prohibits payment of money by an employer or agent to employees, representatives, or labor organizations, and 29 U.S.C. §158(b)(6), which states, inter alia, that it shall be an unfair labor practice for a labor organization or its agents:

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; . . .

Petitioner called respondent as a witness, but he declined to testify on Fifth Amendment grounds, and the committee further upheld respondent's position that he had a right under the Fifth Amendment not to respond to petitioner's subpoena duces tecum requiring production of respondent's business records and supporting documents relating to the four bills from respondent's law firm to [J] Electric. Petitioner then rested.

Respondent called, as for cross-examination, [L], Assistant Disciplinary Counsel, who was prosecuting the instant case. The committee refused respondent's request to examine Disciplinary Counsel's complete file on this matter, but agreed to allow specific questions to be put to [L], by whom respondent sought to support his contentions that this matter should be dismissed because of laches, estoppel, prosecutorial misconduct, and lack of due process. Petitioner conceded at the outset that the Office of Disciplinary Counsel has "no record of any public discipline, no private discipline and no record of any complaint being filed against [Respondent]."

[L] testified that, according to Disciplinary Counsel's file, the Office of Disciplinary Counsel first became aware of respondent's alleged misconduct in June, 1977, when the indictment was issued against Messrs. [A] and [B]. The hearing at that point was adjourned for the day and reconvened August 19, 1982.*

The August hearing opened with stipulations placed on the record that the Office of Disciplinary Counsel became aware of the subject of this proceeding through a staff member seeing a newspaper article, and that [M], Assistant Disciplinary Counsel-in-Charge, has no personal knowledge of facts set forth in his initial letters to respondent dated April 23, 1980, (P.E. 3) and May 23, 1980. (P.E. 4)

[L] was recalled as for cross-examination. He testified that in January, 1978, Disciplinary Counsel received the transcript of respondent's testimony in Federal court, which is marked as P.E. 1 in the instant proceeding. Nearly four years later, January 19, 1982, [L] signed the affidavit attached to the instant petition for discipline, although he had no personal knowledge of the allegations in said petition. The petition was referred to hearing committee [ ] on March 11, 1982. (Respondent's Exhibit [hereinafter "R.E."] B) [L] identified the subpoena served upon respondent, together with attachments thereto which consisted of four purported bills from respondent's law firm to [J] Electrical Construction Company bearing dates and amounts as follows:

---

*The page numbers of the transcript of the continuation hearing do not pick up where first transcript ended, but begin again with page 1. Therefore, the August 19 hearing transcript is herein referred to as "N.T. II" followed by the page number.

| August 29, 1973 | $2,695 |
| May 13, 1974 | 2,365 |
| August 27, 1974 | 1,600 |
| March 26, 1975 | 3,750 |

[L] acknowledged that during the course of the instant investigation he called [E] in Chicago and indicated to him that respondent was involved in an inquiry being pursued by Disciplinary Counsel. Upon examimation by [M], [L] testified that he called [E] because [E], as a witness in the [A] and [B] matter in the Federal court, was a potential witness for the instant disciplinary proceeding. [L] stated, however, that he cautioned [E] that their discussion was to be kept confidential.

Respondent next called as a witness [N], legal secretary to respondent since October, 1980. [N] testified that respondent was, as of that date, retained as counsel for [D] Electric Company and had about eight open files on [I] (President of [J] Electric), and 18 open files for [J] Electric itself. Respondent thereupon rested.

The parties then engaged in extensive argument on the issue of whether Disciplinary Counsel could introduce into evidence the entire petition for discipline and answer thereto. It was the committee's ruling that only those paragraphs of the petition (and corresponding paragraphs in the answer) which respondent admitted in his answer would be admitted into evidence. Earlier in the hearing the following paragraphs of the petition and answer had been admitted into evidence:

Paragraphs    3A
              4
              5
              6
              8 (not 8A or 8B)

12 (not 12A, 12B, or 12C)
19C

At the conclusion of the hearing, after argument thereon, the committee also received into evidence, as admissions, the following paragraphs of the answer, together with the corresponding portions of the petition:

Paragraphs 7 - second sentence
8A - second sentence
11A
11B
11C
18 - first sentence
18B - first two sentences
18C - first two sentences
19B - second sentence

The hearing was thereupon adjourned.

The parties each filed an extensive brief. Thereafter, the committee met to discuss the evidence and made a preliminary finding of misconduct, which it transmitted to the parties by letter dated December 8, 1982, at which time respondent was offered the opportunity to offer mitigation testimony under §89.151 of the Disciplinary Board Rules if he chose to do so. In response, respondent declined to request an additional hearing, but he did submit a four-page document detailing his personal and professional background and professional activities.

## FINDINGS OF FACT

Based upon the testimony and the exhibits of record in this case, the committee makes the following findings of fact:

1. In or about 1974, respondent was retained as legal counsel by the International Brotherhood of

Electrical Workers, Local Number [ ] (in [ ], Pennsylvania) a union in which respondent had maintained continuing membership since 1957.

2. During 1974 and 1975, [A] was the business manager for the International Brotherhood of Electrical Workers Local Number [ ], and [B] served as an employee and officer, including Vice President, of Local Number [ ].

3. Respondent had been personal friends with Messrs. [A] and [B] for a number of years prior to 1974.

4. In August, 1974, [D] Electric Construction Company, a Chicago-based electrical contracting company, whose president was [E], entered into a contract to perform the electrical work at the [ ] Building project, located in downtown [ ], Pennsylvania.

5. [D] Electric Construction Company subcontracted with the [F] Company to provide labor, tools, and supervision for the [ ] project, and the [F] Company ultimately hired electricians for the job through Local Number [ ].

6. Problems developed with the electrical work on the [ ] project and, among other things during January, 1975, a union superintendent, [G], was discharged. Following this discharge, electricians stopped work, allegedly because of a lack of supervision.

7. At about this time, [A] told respondent that [E] had offered him money, which [A] refused, with the hope of getting electrical work stated again.

8. On or about January 24, 1975, respondent attended a meeting with [O] (of [F]), [E] (of [D]), and [A] and [B] (of Local Number [ ]) to discuss the problems with the [ ] project. After this meeting, both [G] and [D], another foreman who had been

discharged by [F], were rehired and the electrical work started again.

9. Despite the work having started again, [B] was informed by representatives of [D] that [D] was dissatisfied with [F's] work on the [ ] project and wished to replace that company with another electrical contractor.

10. In or about February, 1975, respondent met with [B], [H] (a supervisory employee of [D] in charge of the [ ] project), and [I], President and sole shareholder of [J] Electric Company for the [F] Company on the [ ] project.

11. Respondent has also been a long time personal friend of [I], and had previously represented [I] and [J] Electric Company.

12. [I] refused to commit himself to assuming the [F] contract until he could speak to someone in authority from [D] Electric, so a second meeting was scheduled to be held in Atlanta, Georgia, in March, 1975.

13. Respondent attended the Atlanta meeting in March, 1975, along with Messrs. [E], [H], [B], and [I], and the subject thereof was the possible substitution of [J] Electric as the electrical subcontractor on the [ ] project.

14. In the course of the March Atlanta meeting, respondent informed [E] that [I] would require an advance payment before assuming the [F] contract, and that "ten, fifteen thousand dollars" "would be going to [B] ([B]) or [A] ([A])" and that respondent's "fees would be paid." No agreement regarding the payment of an advance was reached at that time, but [E] informed respondent and [I] that payment of an advance in cash would be impossible.

15. Ultimately, in or about March, 1975, [D] Electric and [J] Electric did enter into a subcontract with respect to the electrical work on the [ ] proj-

ect. The compensation payable to [J] Electric under said agreement included:

(a) A "consulting fee," with a lump sum of $30,000 payable simultaneously with the execution of the agreement; and

(b) An amount equal to the greater of 25 percent of the earnings from the project, or $50,000. The $50,000 was to be paid to [J] Electric in five monthly payments of $10,000 each, payable, respectively in or about April, May, June, July, and August, 1975.

16. Respondent was subsequently notified by [I] when [I] ([J]) received the $30,000 advance payment from [D].

17. On March 31, 1975, shortly after receipt of four statements from respondent's law firm, [I] drew four checks on a [J] Electric account, all dated March 31, 1975, and all payable to respondent's law firm, in respective amounts of $2,365, $2,695, $1,600, and $3,750 totaling $10,410. [I] transmitted said checks to respondent and they were negotiated in due course.

18. Within a short period of time after his law firm had received the four checks totaling $10,410, respondent notified both [B] and [A] that he had received the above mentioned amount from [I].

19. Upon learning of the amount received by respondent's law firm, [B] informed respondent that a $10,000 payment from [I] would be "fine" with him.

20. [I] informed respondent that he had discussed with both [A] and [B] the amount and the manner of payments to them.

21. [I] requested respondent to deliver $10,000 to [B], but respondent refused, stating that he "would prefer not to give it (the money) to [B]" and that "[I] should give it to him directly." (P.E. 1, p. 361)

22. Respondent agreed with [I] to deliver money from [I] to [A]. (P.E. 1, p. 363-364)

23. Thereafter, [I] paid [B] amounts of $4,000 and $6,000 on separate dates in or about April, 1975, and advised respondent after each payment.

24. [I] transferred cash to respondent, and respondent transferred said cash to [A] as follows: $1,000 on May 1, 1975; $200 on May 6, 1975; $500 on May 23, 1975; $1,000 on June 16, 1975; $1,000 on July 10, 1975; and $1,000 on August 20, 1975 (totaling $4,700).

25. In August, 1975, [A] was removed from office as business manager for Local Number [ ], and therefore no further payments were made by [I] to respondent for transmission to [A].

26. At all times pertinent to the conduct of respondent as herein described, Federal law provided as follows at 29 U.S.C. §186:

"(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section . . . "

At 28 U.S.C. § 158;

"(b) It shall be an unfair practice for a labor organization or its agents—

• • •

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; . . . "

27. Respondent refused to testify at a grand jury investigation into the above described events on the basis of his privilege against self-incrimination, and on June 29, 1976, [ ], United States District Judge, ordered that respondent give testimony before the grand jury under a grant of immunity and that no testimony or other information compelled under that order could be used against respondent.

28. The immunity granted to respondent was to extend to all judicial prosecutions and all judicial litigation.

29. Records of the Office of Disciplinary Counsel reflect no prior instances of professional misconduct on the part of respondent and, furthermore, it appeared to the Office of Disciplinary Counsel that respondent had engaged in the practice of law

without incident of professional misconduct for in excess of six years since occurrence of the events involved in the instant matter.

30. Disciplinary Counsel presented no evidence that the $10,410 respondent's law firm received from [I] of [J] Electric Company was *not* for past-due legal fees.

## DISCUSSION

The threshold question facing the hearing committee was a purely legal one for which no authority apparently exists in Pennsylvania. That question was: did the grant of immunity conferred upon respondent to compel his testimony in the U.S. District Court for the [   ] District of Pennsylvania in the case against [A] and [B] extend to immunize him also from the use of his testimony against him in disciplinary proceedings? Petitioner and respondent both submitted briefs and the committee also researched this issue.

Basically respondent argued that the grant of immunity should apply because disciplinary proceedings in Pennsylvania have been described as "quasi-criminal" and the privilege against self-incrimination has been held to be applicable to them. Office of Disciplinary Counsel v. Campbell, 463 Pa. 472, 345 A. 2d 616 (1975). See also Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). Respondent also argued that the transcript of testimony from the district court indicated that the Assistant U.S. Attorney stated to respondent on the record at the trial:

Q. Do you essentially understand that nothing that you say in court today can be used against you for any judicial prosecution or any judicial litigation? However, if you do not tell the truth, then you

may be charged with perjury. Do you understand that?

A. I understand that.

Q. That is the only time that any statement you make could be used against you?

A. I understand that. (P.E. 1, p. 314-315)

Petitioner, on the other hand, argued that disciplinary proceedings are *not* criminal proceedings and, therefore, that Disciplinary Counsel is not precluded from using the "immunized" testimony.

Although, as stated, research disclosed no Pennsylvania cases addressing this issue, there are opinions from other jurisdictions which, in the committee's opinion, compel the conclusion that respondent's testimony in Federal court may be used against him in this proceeding. In In re Daley, 549 F. 2d 469 (C.A. 7, 1977) cert. denied 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed. 2d 89 (1977), an attorney was immunized against the use of his compelled testimony under the provisions of 18 U.S.C. §6002 when he testified before a Federal grand jury. In addition, he was specifically immunized against the use of his testimony in a state bar disciplinary proceeding by the U.S. Attorney and the judge. The State Disciplinary Commission was later denied the use of the testimony in an action against the attorney. In reversing this decision of the District Court, the Court of Appeals held that the conferral of immunity which prohibited the use of the compelled testimony in the disciplinary proceeding was beyond fifth amendment imperatives and beyond authority of the Federal prosecutor. The Daley court noted that the immunity statute "deliberately phrased in the language of the Fifth Amendment, immunizes the witness against all potential oppobribum, penalties or disabilities

which occur as a consequence of the compelled disclosures." 549 F. 2d 469, 474.

In the instant case, of course, unlike Daley, there was no specific mention in the grant of immunity that it would apply in state disciplinary proceedings. As may be seen from Daley, even if there had been, that promise of immunity in disciplinary proceedings could, and more than likely would, be held unenforceable. The reasoning behind this is that a disciplinary proceeding, although characterized as quasi-criminal, carries no possible criminal sanctions and, indeed, is not intended to "punish" but rather to protect the public from practitioners deemed unfit. As the court stated in Daley:

The essence of state bar disciplinary proceedings, however, is not a resolution regarding the alleged criminality of a person's acts, but rather a determination of the moral fitness of an attorney to continue in the practice of law. Although conduct which could form the basis for a criminal prosecution might also underlie the institution of disciplinary proceedings, the focus is upon gauging an individual's character and fitness, and not upon adjudging the criminality of his prior acts or inflicting punishment for them. 549 F. 2d 469, 474.

Other opinions are in accord with the reasoning in Daley, supra. For example, see The Committee on Legal Ethics of the West Virginia State Bar v. Graziani, 200 S.E.2d 353 (W.Va., 1973) and Segretti v. The State Bar of California, 544 P.2d 929 (Calif., 1976).

The committee, based upon the above mentioned decisions and also upon its belief that it would be indeed unwise and unfortunate to permit a grant of immunity to insulate a practitioner from being held to account for his acknowledged misdeeds, declined to extend respondent's grant of immunity to

these proceedings and, therefore, admitted into evidence petitioner's Exhibit 1, which was the record of respondent's testimony in Federal court.

Disciplinary Counsel in the instant proceeding presented no witnesses to testify as to respondent's misconduct, but instead relied solely upon respondent's testimony in Federal court and upon exhibits which reinforced that testimony and which had been identified in the trial of Messrs. [A] and [B].

The following portions of respondent's testimony in that trial are relevant:

Q. (By prosecutor [K]) And did there come a point when you became engaged in a lawyer-client capacity with Local Union [   ]?

A. (By respondent) Yes. I believe that was in 1974.

Q. In what capacity were you engaged with respect to Local [   ] in 1974?

A. I was retained as an attorney. (P.E. 1, p. 317)

Q. Now what about your relationship with an individual by the name of [I], [I]? Are you familiar with him?

A. Yes, I am.

Q. How do you know [I]?

• • •

A. As soon as I became an attorney, [I] was probably my first client. He came to me immediately. (P.E. 1, p. 318)

Respondent further testified that at that time, [A] was the business manager of the union (P.E. 1, p. 320) and that [A] asked respondent to keep accurate notes of any conversations and meetings with regard to the [   ] project. (P.E. 1, p. 323) Respondent explained that:

. . . if I had a meeting with [A] or a meeting with any of the contractors, any persons involved, right

after that meeting I would jot down on a piece of paper what transpired at that meeting or in that conversation; and then when I got back to my office, I would put all these notes into one file, and then I had my secretary type up a master sheet of all these events; and this item [Government Exhibits 15 and 16; P.E. 2 herein] reflects the master sheet of these events. (P.E. 1, p. 323, 324)

Respondent testified in Federal court as follows about the circumstances surrounding the awarding of the electrical contract on the [  ] project to [J] and the money which was received by him and by [A] and [B] from [I] of [J]:

A. (By respondent) Some time at the end of February of '75, beginning of March, right around that time period, I guess either [I] or [B] called me and said that [B] had talked to [H] of [D], that they were dissatisfied with [F] on the project and that they would like to talk to [I] about replacing [F].

[B] told me that tentatively—or [I]. I don't know if it was —Either one, [I] or [B] called me and says tentatively a meeting had been scheduled in the [  ] in [  ] for [B], [I], [H], and myself to attend.

Q. Did you go to that meeting?

A. Yes, I did.

Q. Who else was present and what was discussed at that meeting?

A. The four people I mentioned, [B], [I], [H], myself.

Q. What was the purpose of that meeting?

A. The purpose of the meeting was to see if [I] was interested in having [J] Electric come in and replace [F] Electric on the project.

Q. Was anything resolved at that meeting?

A. No. (P.E. 1, p. 343, 344)

• • •

Q. Now, did you ever get into any discussions

with either [A] or [B] about your intention to send a bill to [I] for legal fees if he should get the job?

A. I never mentioned sending a bill to [I]. I told [B] I spoke with [A] and with [I], that if [I] would get this job, that I was going to bill him for all the work I had done for him in the past eight years. He never paid me.

• • •

[I] was in bad financial condition. We were all friends. We wanted [I] to have the job, and if [I] got the job, he was going to pay money to [B], to [A], and pay my legal fees. (P.E. 1, p. 345-346)

Respondent testified about a meeting in Atlanta on March 6, 1975, attended by [I], [E] (of [D]), [H] (of [D]), [B], and respondent.

Q. Then what occurred?

A. Then [E] asked what the terms of the contract would be, and I negotiated for [I] in a contract. [I] and I had talked about it. [I] told me he wanted $80,000 in advance, and knowing we wouldn't get it, he asked me to ask for fifty percent. He says, "Negotiate from that point."

Q. Okay. Now you knew that out of that $80,000, money was going to go to you, to [B], and to [A]?

A. Yes, I did. (P.E. 1, p. 350)

• • • •

Q. Now prior to your attendance at this meeting in Atlanta, you had discussed this request that you were going to make of [E] for money with both [A] and [B]; is that correct?

A. That's correct.

Q. And they both knew that if you were successful in your negotiations in Atlanta, they would both be getting money; is that correct?

A. That's correct.

Q. And they both knew that if you were suc-

cessful in your negotiations in Atlanta, they would both be getting money; is that correct?

A. That's correct. (P.E. 1, p. 355)

• • •

Q. Do you recall now the terms of the contract, what money was to be paid up front and—

A. Yeah. The contract called for $80,000. The percentage was decreased from 50 percent to 25 percent of the profits at the end. [I] was to receive $30,000 in advance and he was to receive $10,000 per month for five months.

Q. And the $30,000 that he was to receive in advance as a lump sum, was that referred to as a consulting fee?

A. The entire $80,000 was.

Q. Now, did you have any discussion with [I] concerning the receipt of this $30,000 check?

A. When [I]—I think he got a check for $22,000 first for payroll, and then he got a check for $30,000. He called me and said 'Send you bill', and I sent him a bill. I think I sent him four bills at that time.

Q. Did you subsequently receive a check or a series of checks for the bills you sent to [I]?

A. I think I received four checks totaling $10,410. (P.E. 1, p. 359)

Q. Now, did you have any further discussions around that time concerning the $30,000 that [I] received from [D] Electric?

A. Oh, I talked to [B], talked to [A] about it.

Q. What was the nature of the discussions you had with them?

A. [B] asked what I had received. I told him I received $10,410, that [I] got $30,000 in advance.

Q. What about [A]? Did you have any discussions with him about it?

A. I think I told [A] that I received my legal fees. I

don't know if I told him it was $10,410, but I told him I got my fees.

Q. You told them both that you had been paid?

A. Yes.

Q. What happened next then with respect to this $30,000 that [I] received?

A. As I recall, [I] called me and asked if I would give the money to [B].

Q. [I] called you?

A. [I] called and he says, "Will you give the money to [B]?"

And I says, "[I], I prefer not to. I prefer you pay [B] yourself."

Q. Was there a discussion at that time of an amount that was to be given to [B]?

A. [I] and I discussed it, and it was $10,000.

Q. You arrived at that decision that it was to be $10,000.

A. I didn't arrive at that decision.

Q. Well, how was the amount determined?

A. If I recall, I talked to [B]—Oh, he asked what I had gotten, and I told him $10,410, and [B], he said something to the effect "That's fine," or "That's okay with me," something to that effect. (P.E. 1, p. 360-361)

• • •

Respondent further testified that he learned that [I] had paid [B] directly the amount of $10,000 in two payments. (P.E. 1, p. 362) With respect to the payments to [A], respondent testified:

Q. Now was there any discussion with [A] concerning what he was to receive?

A. Well, as to the amount, I think everyone just assumed that it would be the same thing that [B] got.

Q. When you say everyone, who would you—

A. [I], [B], and I.

Q. [I], [B], and you, okay. Go ahead and finish your thought.

A. Again, I had talked to [I]. [I] asked me if I would give the money to [A], and I said no; and [A] says, "I don't want anything from [I]. I'm not going to accept anything from him."

And this went on for several days, and [I] finally says, "Hey, [Respondent], how about giving this to [A]?"

And I says, "Okay, I will." (P.E. 1, p. 363-364)

• • •

Q. How was it arranged that these payments would be given to [A]?

A. As I said, I didn't want to pay [A] directly—or [I]—[A] didn't want to receive it from [I]. So I agreed. As [I] would give me the money I would give it to [A].

Q. Okay. In what form would [I] give you this money?

A. Cash. (P.E. 1, p. 364-365)

Respondent testified that he kept a record of the payments he passed on to [A] on the front side of one of his law firm's envelopes, which was marked as Government Exhibit 18 (P.E. 1, p. 369) and petitioner's Exhibit 2-B herein.

Thus, there appears to be no question that respondent, by passing money from [I] (the contractor) to [A] (the union official) violated Federal law. Although respondent notes in his brief, and in some cases rightly so, that the record in the disciplinary hearings contains no proof of certain of Disciplinary Counsel's proposed findings of facts, it is inescapable that respondent did engage in the above mentioned misconduct. Indeed, the following excerpts from respondent's brief to the hearing committee are appropriate for consideration:

The respondent does not take the position that he is free from the consequence of all of his actions in regard to the [A] and [B] matter. However, respondent does take the position that if he breached the Disciplinary Rules, he did so out of naivety, mental lapse, or similar inexcusable reasons. At no time did respondent act with a criminal or wrongful intent. The only profit that respondent made was for legal services actually performed and reasonably charged. *The act which respondent did and which he should not have done was to transfer funds from [I] to [A]*. (Emphasis added.) (Respondent's brief, p. 62).

[I] asked respondent to give [B] money and respondent refused. [I] asked respondent to give [A] money and respondent refused. Later, respondent, without any motive for profit or gain, agreed to transfer the money from [I] to [A]. This act of naivety, stupidity, or mental lapse, respondent admits with great regret. However, respondent did not act with immoral or criminal intent. These four individuals were extremely close friends and respondent did not view this transfer as a criminal or unethical act. Had he to do this act over, respondent would certainly not do so. This was a painful and expensive lesson which will be deeply etched on respondent for the rest of his life. (Respondent's brief, p. 65)

Thus, there is no doubt that respondent engaged in misconduct in assuming an active role in the payment of monies to [A] and [B] in violation of Federal law.

Disciplinary Counsel also charged that the receipt by respondent's law firm of the $10,410 was misconduct, and that respondent's contention that the amount was for previously-owned legal fees was a sham. Respondent contended throughout

these proceedings that he did perform legal work for [I], for which there were amounts due and owing, and that the $10,410 represented payment of these fees. It is curious, of course, that the amount paid as legal fees so closely paralleled the amount paid to [B] (10,410 v. $10,000), and the amount targeted for [A] ($10,000), and that it was roughly one-third of the advance received by [I] from [D]. Moreover, respondent repeatedly stated that [I] had owed respondent "for approximately eight years." (See, for example, respondent's answer, paragraph 8, first sentence) However, since respondent graduated from law school in 1968 (See Exhibit A hereto) and could not have been admitted to the bar before the fall of 1968, when the $10,410 was received in March, 1975, respondent had only been practicing for about six and one-half years.

The burden of proof on petitioner in a disciplinary proceeding is "clear and convincing," however, and that standard has, in the committee's opinion, not been met with respect to the $10,410 paid to respondent. Respondent did submit copies of bills totaling that amount, and there were nothing except bare allegations and suspicions advanced by Disciplinary Counsel that these bills were not genuine. Thus, the committee is unable to find that the receipt of the $10,410 from [I] constituted misconduct.

The misconduct which *was* proved, however, is most serious. Respondent, since he had acted as union counsel, should certainly have been aware that his conduct with regard to the [B] and [A] payments was contrary to Federal law. The fact he was dealing with "friends" is no excuse whatsoever.

As for the recommended discipline to be imposed, the committee feels it must take into account that this misconduct occurred nearly five years before

the instant petition was filed. Moreover, Disciplinary Counsel acknowledged in his brief to the committee that there have been no other complaints lodged against respondent, either prior to or since the misconduct in question. Disciplinary Counsel stated in his brief, after citing respondent's otherwise unblemished record:

. . . certain mitigation factors are present in the instant case which deserve the attention of the Hearing Committee in making its determination as to the type of discipline that should be imposed. (Respondent's brief, p. 43)

However, Disciplinary Counsel nevertheless submitted that public discipline is warranted.

After consideration, the committee has determined that public discipline is not warranted. Respondent has, in his brief, acknowledged his misconduct and has pledged never to repeat it. His otherwise spotless disciplinary record weighs heavily in favor of not submitting him at this late date to public censure. Respondent's misconduct is a grave offense and the committee in no way intends to suggest it is anything but. The mitigating factors are such, however, that the committee recommends private reprimand as the appropriate discipline to be imposed.

## CONCLUSIONS OF LAW

1. The granting of immunity to respondent in the course of a trial in the United States District Court for the [ ] District of Pennsylvania does not extend to disciplinary proceedings and, therefore, respondent's testimony in Federal court may be used against him in said disciplinary proceedings.

2. Respondent's actions between February and August, 1975, as attorney and agent of [I] ([J] Elec-

682

tric), an electrical subcontractor at the [   ] Building project in [   ], Pennsylvania, in agreeing to, facilitating, and participating in the payment and delivery of money from [I] to two officers of the IBEW, Local Number [   ], constituted conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Disciplinary Rule 1-102(A)(4) and conduct which adversely reflects on respondent's fitness to practice law, in violation of Disciplinary Rule 1-102(A)(6).

## RECOMMENDED DISPOSITION
## OF THE PETITION

The conduct of respondent as set forth herein violated Disciplinary Rules 1-102(A)(4) and 1-102(A)(6) and the committee recommends that respondent receive a private reprimand.

## ORDER

McDONNELL, *Chairman*, and now, August 24, 1983 the report and recommendation of the hearing committee is accepted and respondent shall be subjected to private reprimand by the board.