Filed 3/3/16  Gonzales v. Oliva CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CARLOS GONZALES,<br><br>      Appellant,<br><br>    v.<br><br>YEANINA OLIVA,<br><br>      Respondent. | C074405<br><br>(Super. Ct. No. 08FL09159) |

This is a judgment roll appeal in a family law matter involving a custody battle between Carlos Gonzales and Yeanina Oliva over their son, C., who was four years old at the time of trial.  In addition to seeking modification of an existing joint custody order to give Gonzales sole custody of C., Gonzales sought a Domestic Violence Prevention Act (DVPA) restraining order against Oliva.  (Fam. Code, § 6200 et seq.)[1]  Oliva opposed

---

[1]    Undesignated statutory references are to the Family Code.

1

each of Gonzales's requests, requested she be given sole custody of C., and also requested a DVPA restraining order against Gonzales.

Following an evidentiary hearing, the trial court ordered the continuation of joint custody, with C. to live primarily with Oliva. Gonzales does not challenge this decision on appeal. He does challenge the trial court's denial of his request for a restraining order against Oliva and further challenges the trial court's grant of her request for such an order against him. Because he has not shown any error on the face of the record, we affirm.

BACKGROUND

Litigation in this case began in December 2008, about two months before C. was born, with Gonzales filing a petition to establish paternity. Between then and the date of the orders being appealed, Oliva filed four separate requests for a DVPA restraining order against Gonzales, who in turn filed three separate requests for such an order against Oliva. The latter round of restraining order litigation is the subject of this appeal. However, in order to provide context for the present round of litigation, we briefly set forth the facts surrounding the previous rounds. We also position these rounds of restraining order litigation in the context of the larger custody dispute, without attempting to describe every filing and argument raised therein.

***First Round***

We begin our summary of the facts surrounding the first round of restraining order litigation in May 2009. That month, Oliva signed a stipulation granting Gonzales sole legal and physical custody of their child, with Oliva retaining no visitation rights. The following January, Oliva filed an ex parte application seeking sole custody of C. that was denied for lack of notice, and that prompted Gonzales to file an order to show cause (OSC) seeking child support from Oliva. Oliva then filed a noticed motion seeking sole

2

custody of C., alleging she did not understand the May 2009 custody stipulation because she was not fluent in English and Gonzales threatened to tell the court he and Oliva were cousins if she did not sign the document. This, he claimed, would result in C. being placed in foster care. Oliva also alleged, among other things, Gonzales had extorted money from her between November 2008 and November 2009, said he was "'keeping the baby'" when she refused to continue giving him her income, and he threatened people who were helping her financially. Oliva opposed Gonzales's request for child support on the same basis, adding C. lived with her during the period of time Gonzales was allegedly extorting money from her. Gonzales opposed Oliva's request to modify custody, claiming the previous stipulation was translated for Oliva, who acknowledged she understood the contents before signing the document. He also claimed, among other things, that while Oliva was pregnant with C., she expressed a desire to return to her native country of Ecuador, causing Gonzales to fear she would leave the country with C. if given custody of the child.

In April 2010, after referring the matter to Family Court Services, the trial court adopted a mediator's recommendation that the parties be given joint legal and physical custody of C. pending a custody hearing set for July 2010.

About two weeks later, Oliva filed her first request for a DVPA restraining order against Gonzales. This request was based on an alleged incident occurring two days before. Oliva claimed she went to Gonzales's apartment on her custody day to pick up C., but was not allowed to do so. According to Oliva, Gonzales was "very upset" and grabbed her arm, saying, "the next time [she] showed up without calling" would "cost" her, which she understood to be a threat of violence. The request also described a second alleged incident of abuse, occurring the previous November, in which Gonzales was claimed to have ordered Oliva to undress while at his apartment. After she complied, he

3

took her clothes and "all [her] belongings," including her birth certificate, social security card, and passport, and then locked her in the apartment for three days. According to Oliva, she was unable to leave "because of fear." When Gonzales returned three days later, he said: "'I left you here for [three] days so that you can think about what you are doing.'" At this point, Oliva realized her situation was dangerous and went to a local domestic violence shelter. The request then described a third alleged incident of abuse, occurring four days after C. was born. According to Oliva, when Gonzales discovered he was not listed as C.'s father in the hospital records, he "pull[ed] [her] down the stairs and forced [her] to go with him back to the hospital" to put his name on these records, causing her caesarean section stitches to come apart. Finally, Oliva complained Gonzales shaved C.'s head and eyebrows on one occasion, and on another occasion held him upside down by one foot.

The following month, Gonzales requested his own DVPA restraining order against Oliva. This request was based on the same incident prompting Oliva's request, except Gonzales claimed Oliva "jumped [a] 6-foot fence" to get into his yard while his mother was watching C., and then "pounded on the doors of [his] house" for 25 minutes. When Gonzales arrived and refused to give C. to her, Oliva got into her car and said, "'You'll see,'" before trying to hit Gonzales with the car. The request also described an alleged incident, occurring about two weeks before, in which Oliva threatened to "'bring [Gonzales] under investigation'" and have C. "taken away" unless Gonzales dropped a lawsuit he filed against her involving allegations she and her uncle had fraudulently pulled his credit report. A third claimed incident of abuse involved the alleged pulling of Gonzales's credit report, i.e., Oliva and her uncle were claimed to have fraudulently applied for a loan in Gonzales's name and used the loan officer processing the application to pull his credit report that was then filed in connection with the custody proceedings

4

previously described. Gonzales also alleged Oliva "has been threatening to take [C.] to Ecuador" and "has threatened on numerous occasions to abduct him or have him taken away." Finally, Gonzales cited a restraining order previously issued against Oliva when she was six months pregnant with C. This order protected Beatris Flores, one of Gonzales's "female friends," and was based on an incident in which Oliva was claimed to have "jumped over [a] 6 foot fence" at Flores's house, "pounded" on her doors looking for Gonzales, and then broke a living room window using hedge clippers.

A hearing was held on May 12, 2010, during which Gonzales and Oliva agreed to drop their respective restraining order requests. They also agreed, among other things, the July 2010 custody hearing would be vacated and the existing parenting plan would be modified to provide custody exchanges would take place at the Sacramento County Sheriff's Department. This stipulation of the parties was "so ordered" by the trial court.

### Second Round

In September 2010, Gonzales started off the second round of restraining order litigation. His request for a DVPA restraining order against Oliva was based on an incident occurring three days earlier. According to Gonzales, when he brought C. to the sheriff's department parking lot for a custody exchange, Oliva started "cursing and yelling" at him in Spanish and then pushed him while he was holding C., causing him to "stumble back" with the child in his arms. When Gonzales told her to stop, she "kept yelling at [him] in Spanish and aggressively pushing [his] face." He eventually handed C. over to Oliva, who left with the child. Gonzales then reported the incident to the sheriff's department. Gonzales's request for a restraining order also listed the previous alleged incidents of abuse that formed the basis for his first request.

Oliva apparently responded by requesting her own DVPA restraining order against Gonzales. Although this request is not included in the record, Gonzales's response notes

5

Oliva claimed he was the one who did the pushing in the sheriff's department parking lot. Oliva also apparently based her request for a restraining order on the previous alleged incidents of abuse that formed the basis for her first request, adding allegations Gonzales sent her abusive e-mails, caused the police to perform welfare checks on her, vandalized her property on two occasions, and spied on her with binoculars on one occasion.

In October 2010, Gonzales and Oliva again agreed to drop their respective restraining order requests and further agreed to a "50/50 equal time share" custody arrangement, with custody exchanges occurring at an agency-supervised exchange location and communication between Gonzales and Oliva occurring only through e-mail or through the exchange supervisor.

### Third Round

The third round of litigation began the following month with Gonzales filing an OSC seeking modification of custody. Gonzales sought sole legal and physical custody of C. based on photographs he discovered, apparently taken at a Halloween party and posted on Facebook, one of which depicts C. holding what appears to be a handgun.

Five days later, Oliva requested a DVPA restraining order against Gonzales. This request described the most recent abuse by Gonzales invading her privacy by breaking into her Facebook and e-mail accounts, printing the aforementioned pictures, and attaching them to his OSC regarding custody. The request also described as previous incidents of abuse many of the same alleged incidents that formed the basis for Oliva's second request for a DVPA restraining order against Gonzales. Specifically, she again alleged Gonzales sent her harassing e-mails, filed false police reports causing officers to come to her apartment and workplace, spied on her with binoculars, and vandalized her property and that of her roommate. Oliva further alleged Gonzales treated C. "harshly," delivered the child to her with "bumps and scra[t]ches on his head," and allowed him to

6

eat hot chili sauce with chips on one occasion. Oliva also requested modification of custody as part of her DVPA restraining order application, seeking sole legal and physical custody of C. In that regard, she alleged "Gonzales is having a hard time nurturing and taking care of [C.] in his parenting time," claiming he delivered C. to her on one occasion while "sick" and "with bumps and scratches on his head, and [his] head shaved . . . and [his] eyebrow[s] shaved."

In response to Gonzales's OSC regarding custody, Oliva claimed the photographs were "manipulated" and explained the gun in C.'s hands was "a toy." She also acknowledged some of the guests at the Halloween party appeared to be drinking in the photographs, but claimed she left the party with C. before those pictures were taken. With respect to other photographs that apparently depicted various people smoking, Oliva claimed these were taken at a different party and the individuals shown therein were eating rather than smoking. Oliva also attached letters apparently written by attendees of one or both of the parties that corroborated her account of events.

In March 2011, after appointing a private marriage and family therapist to perform a child custody evaluation, the trial court largely adopted the therapist's recommendation regarding custody, i.e., continuation of joint legal and physical custody of C., but made minor modifications regarding custody exchanges. After this custody order, the litigation front remained quiet for an entire year.

### *Resumption of Hostilities*

In April 2012, Oliva filed a motion to modify the parenting schedule to give Gonzales custody of C. during the week for Oliva to work additional hours and earn more income to purchase a home. Oliva also asked the trial court to order Gonzales to complete a drug rehabilitation program, citing various text messages she apparently received from Gonzales that, as she put it, "sound[ed] like he was intoxicated." Oliva

7

further asked the trial court to review various other text messages and a photograph of C. apparently depicting a bloody lip. The following month, Gonzales filed a motion to modify custody, seeking sole physical custody of C. and an order requiring Oliva to complete anger management and parenting classes, alleging repeated "physical and emotional abuse," including one incident in which Oliva was claimed to have "backhanded [C.] across his mouth." Gonzales also alleged Oliva periodically kept C. overnight at "a new friend's house," where "there are numerous adult males" and "alcohol consumption."

In June 2012, after referring the matter to Family Court Services, the trial court adopted a counselor's recommendation regarding custody, i.e., continuation of joint legal and physical custody of C. with various modifications to the custody schedule.

### Current Round

This brings us to the current round of restraining order litigation giving rise to this appeal. In October 2012, Gonzales sought a DVPA restraining order against Oliva based on allegations Oliva created a Facebook account in Gonzales's name that included photographs of Gonzales holding C. and a note in Oliva's handwriting listing Gonzales's personal information and accusing him of being a "child predator" that caused him to receive "harassing phone calls." The posting also included a picture of Gonzales's car he claimed was taken by Oliva while driving past his house. Gonzales further alleged Oliva was videotaping him during custody exchanges against court orders, illegally recording his phone calls with C., and causing other people to follow him. He also claimed Oliva threatened his life on two occasions. In August 2012, she allegedly posted, "'This all ends soon'" on Facebook, referring to the custody battle over C. In May 2012, she allegedly told Gonzales in person: "'The only way to stop this (custody battle) is to put a bullet in your head.'" Finally, Gonzales reasserted the prior alleged incidents of abuse

8

that formed the basis for his previous restraining order requests and requests to modify custody.

The following month, Gonzales filed another request to modify custody, again seeking sole legal and physical custody of C. The trial court apparently again referred the matter to Family Court Services for mediation. Gonzales and Oliva met separately with the appointed mediator, Pat Riley. According to Gonzales, he designated Oliva's mediation documents and the subsequent mediation report as part of the appellate record, but the clerk was unable to locate these documents. Thus, *they are not part of the record on appeal*. The same month, Gonzales caused a document production subpoena to issue ordering Scambook, LLC to produce contact information for a user account that was used to post "a complaint . . . on Scambook.com accusing [Gonzales] of being a child predator," that "contained captions almost identical" to the Facebook account described above. He apparently also caused another subpoena to issue ordering Verizon to produce identifying information regarding the phone number used to make the harassing phone calls cited in his restraining order request. The registered user of this phone number was apparently a company using the name California Cascade, which prompted another subpoena to issue to that company seeking identifying information for the employee authorized to use that particular phone.

In January 2013, Oliva sought her own DVPA restraining order against Gonzales. Her request for such an order was based on allegations Gonzales tried to acquire her address by having a subpoena served on her new husband's employer seeking his residential address despite Oliva's enrollment in an address confidentiality program run by the California Secretary of State. The second most recent incident of alleged abuse also occurred the previous month, when Gonzales was claimed to have arrived at Oliva's home with police at 9:30 a.m. the day after Christmas. According to Oliva, he falsely

told police the custody schedule required Oliva to deliver C. to him at 9:00 a.m. when the custody schedule actually called for a 10:00 a.m. exchange. Oliva alleged additional incidents of abuse that were apparently described in an attachment to her restraining order request. *This attachment does not appear in the record on appeal*. However, Gonzales's response to Oliva's restraining order request indicates these prior incidents of alleged abuse are the same incidents that formed the basis for her previous restraining order requests and requests to modify custody. Oliva further requested modification of custody as part of her restraining order application, seeking sole custody of C., and citing as the basis for this request *the same attachment that does not appear in the appellate record*.

The following month, the trial court adopted mediator Riley's recommendation regarding custody (*which again does not appear in the record*) pending a combined trial on the custody matter and the opposing DVPA restraining order requests. Gonzales was also ordered, apparently based on Riley's recommendation, to submit to a forensic psychological evaluation.

### *Trial and Decision*

Trial commenced in May 2013. As previously mentioned, *the record does not contain a transcript of the proceedings*. Accordingly, as we explain in greater detail below, Gonzales may not challenge the sufficiency of the evidence to support the trial court's findings, but instead may challenge only (1) the sufficiency of the pleadings, and (2) the sufficiency of the findings in support of the judgment. (See *Bristow v. Morelli* (1969) 270 Cal.App.2d 894, 898.) We have already described the pleadings in some detail. With respect to the trial court's findings regarding the parties' restraining order requests, the trial court found Gonzales "[i]ntentionally caused bodily injury" to Oliva, "[i]ntentionally or recklessly attempted to cause bodily injury" to Oliva, "[p]laced [Oliva]

10

in reasonable apprehension of imminent serious bodily injury," and "engaged in conduct involving threats of violence," thereby causing "mental and emotional harm" to Oliva. On this basis, the trial court granted Oliva's request for a DVPA restraining order. Denying Gonzales's request for such an order, the trial court found Oliva did not "[i]ntentionally or recklessly cause[] bodily injury" to Gonzales, "[i]ntentionally or recklessly attempt[] to cause bodily injury" to Gonzales, or "[p]lace[] [Gonzales] in reasonable apprehension of imminent serious bodily injury." Acknowledging abuse under the DVPA need not be actual physical abuse or assaultive conduct, but encompasses any behavior that could be enjoined pursuant to section 6320, which we discuss later in this opinion, the trial court found "it cannot be said that [Oliva's] Internet postings rise to the level to compel a DVPA restraining order," citing section 6340, subdivision (a)'s direction: "'When determining whether to make any orders [under this subdivision], the court shall consider whether failure to make any [of these] orders may jeopardize the safety of the petitioner.'"

## DISCUSSION

## I

### *Standard of Review*

"'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Where, as here, the appeal is on the judgment roll alone, "[t]he question of the sufficiency of the evidence to support the findings [of the trial court] is not open." (*Bristow v. Morelli* (1969) 270 Cal.App.2d 894, 898; *Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1082.) Instead, "the evidence is

11

conclusively presumed to support the findings, and the only questions presented are the sufficiency of the pleadings and whether the findings support the judgment." (*Bristow v. Morelli*, *supra*, 270 Cal.App.2d at p. 898.)

"A grant or denial of injunctive relief is generally reviewed for abuse of discretion. [Citation.] This standard applies to a grant or denial of a protective order under the DVPA. [Citation.] [¶] 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.] At the outset, however, we must determine whether the trial court applied the correct legal standard to the issue in exercising its discretion, which is a question of law for this court. 'The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion.' [Citations.]" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420-421; see also *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 337.)

Thus, in determining whether the trial court abused its discretion in denying Gonzales's request for a DVPA restraining order against Oliva, or in granting Oliva's request for such an order against Gonzales, we are limited to determining whether the trial court applied the correct legal standard to the matter, whether the pleadings are sufficient to obtain the requested relief, and whether the trial court's findings set forth in its statement of decision support the issuance of the restraining order against Gonzales and the denial of such an order against Oliva. Finally, with respect to the latter inquiry, we are further constrained by Code of Civil Procedure section 634's requirement that omissions or ambiguities in the statement of decision must be brought to the trial court's attention; failure to do so forfeits "the right to complain of such errors on appeal, thereby

12

allowing the appellate court to make implied findings in favor of the prevailing party." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132 (*Arceneaux*).)

## II

### *The Domestic Violence Prevention Act*

"The DVPA defines domestic violence as 'abuse' perpetrated against enumerated individuals, including a former spouse or cohabitant. (§ 6211, subds. (a), (b).) Its purpose is to prevent the recurrence of acts of such abuse and to provide for a separation of those involved in order to resolve its underlying causes. (§ 6220.) To this end, the DVPA provides for the issuance of restraining or 'protective' orders, either ex parte or after hearing, that enjoin specific acts of abuse. The act defines 'abuse' as either an intentional or reckless act that causes or attempts to cause bodily injury; an act of sexual assault; an act that places a person in reasonable apprehension of imminent serious bodily injury to himself or herself or to another; and an act that involves any behavior that has been or may be enjoined under section 6320. (§ 6203.)" (*Nakamura v. Parker*, *supra*, 156 Cal.App.4th at p. 334.) The version of section 6320 in effect at the time of trial provided in relevant part: "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (Former § 6320; Stats. 2010, ch. 572, § 16, p. ___.)

"A trial court is vested with discretion to issue a protective order under the DVPA simply on the basis of an affidavit showing past abuse. Specifically, it 'may' issue an

order 'with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.' (§ 6300.)" (*Nakamura v. Parker*, *supra*, 156 Cal.App.4th at p. 334.) Moreover, "[w]hen determining whether to make" any such orders "after notice and a hearing," "the court shall consider whether failure to make any of these orders may jeopardize the safety of the petitioner . . . ." (Former § 6340, subd. (a); see also Stats. 2010, ch. 352, § 19, p. ___.)

## III

### *Denial of Gonzales's Request for a DVPA Restraining Order*

Gonzales contends the trial court abused its discretion in denying his request for a DVPA restraining order against Oliva because he submitted evidence satisfying each element required for issuance of such an order.

Our consideration of this argument is limited by the fact this appeal is made on the judgment roll. As previously explained, in such an appellate posture, "the evidence is conclusively presumed to support the [trial court's] findings, and the only questions presented are the sufficiency of the pleadings and whether the findings support the judgment." (*Bristow v. Morelli*, *supra*, 270 Cal.App.2d at p. 898.) Gonzales sufficiently pleaded his entitlement to a DVPA restraining order. However, we must conclusively presume the evidence adduced at trial supports the trial court's explicit findings Oliva did not intentionally or recklessly cause or attempt to cause bodily injury to Gonzales or place Gonzales in reasonable apprehension of imminent serious bodily injury. (See § 6203, subd. (a)(1), (3).) Because Gonzales did not allege any sexual assault committed by Oliva (see *id*., subd. (a)(2)), we are left with only allegations she engaged in "behavior that has been or could be enjoined pursuant to Section 6320" (*id*., subd. (a)(4)), i.e.,

14

"molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party." (Former § 6320; Stats. 2010, ch. 572, § 16, p. ___.)

In this regard, Gonzales alleged Oliva created the defamatory Facebook account described earlier in this opinion that he claimed caused him to receive harassing phone calls. He also alleged Oliva drove by his house to take a picture of his car, videotaped custody exchanges against court orders, illegally recorded his phone calls with C., caused other people to follow him, threatened his life on two occasions, hit him and C. during a custody exchange, stole his identity, and, when she was six months pregnant with C., broke into a friend's home causing a restraining order to issue against her based on that incident.

We agree any of these behaviors could be enjoined under section 6320. Thus, if Gonzales proved "to the satisfaction of the court" that Oliva engaged in this alleged conduct, the trial court would have been authorized under section 6300 ["An order *may* be issued . . . ."] to issue the requested order. (§ 6300, italics added.) The trial court specifically found Oliva made the defamatory Facebook account, and other "postings" not specifically alleged in Gonzales's restraining order request, but that were apparently proved at trial. However, the fact the trial court would have been authorized under section 6300 to issue a protective order based on this conduct does not mean the trial court abused its discretion by declining to issue the order. Indeed, the trial court acknowledged abuse under the DVPA need not be actual physical abuse or assaultive conduct, but nevertheless concluded the postings "cannot be said [to have] rise[n] to the

15

level to compel a DVPA restraining order," citing section 6340, subdivision (a)'s direction: "'When determining whether to make any orders [under this subdivision], the court shall consider whether failure to make any [of these] orders may jeopardize the safety of the petitioner.'" We cannot conclude this determination exceeded the limits of legal discretion. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [reviewing court will not disturb a discretionary determination unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination].)

The trial court did not issue explicit findings regarding the other alleged conduct Gonzales claims "was itself reversible error." This argument is forfeited by Gonzales's failure to bring the lack of findings in the statement of decision to the trial court's attention. Our Supreme Court has held, "if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.) This is because Code of Civil Procedure sections 632 and 634 "describe a two-step process" that must be satisfied in order for a party "to avoid implied findings on appeal favorable to the judgment." (*Id*. at p. 1134.) First, under Code of Civil Procedure section 632, the party must "request the court to issue a statement of decision explaining the basis of its determination, and . . . specify the issues on which the party is requesting the statement"; and second, "under [Code of Civil Procedure] section 634, the party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party." (*Id*. at p. 1133.)

Gonzales asserts his request for a statement of decision, fulfilling the first step of the process, also satisfied the second step. This argument was specifically rejected by our

Supreme Court in *Arceneaux*, *supra*, 51 Cal.3d at page 1134. Here, as there, "[Gonzales] has apparently lost sight of the fact that the requirement of [Code of Civil Procedure] section 634 is that a claimed deficiency *in the statement of decision* must be brought to the trial court's attention. A party who asks only that the court explain its tentative decision by requesting a statement as to a particular issue obviously has not fulfilled this requirement. If [Gonzales's] assertion were correct, the requirement of [Code of Civil Procedure] section 634 that errors or omissions in a statement of decision must be brought to the trial court's attention would be nullified." (*Id*. at p. 1134.) We therefore infer the trial court found Oliva did not engage in the other alleged conduct forming the basis of Gonzales's request for a DVPA restraining order. And given this is a judgment roll appeal, we must conclusively presume the evidence adduced during trial supports these implied findings.

Finally, Gonzales asserts the trial court violated section 6306, which directs the trial court to "ensure that a search is or has been conducted to determine if the subject of the proposed order . . . has any prior restraining order," by failing to search for or consider the prior restraining order issued against Oliva when she was six months pregnant. While Gonzales is correct the statement of decision does not reveal such a search was conducted, or Oliva's prior restraining order was considered, we presume the trial court followed the law (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563) and Gonzales's failure to point out this alleged deficiency in the statement of decision also forfeits his reliance thereon in this appeal (see *Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134).

On this record, we cannot conclude the trial court abused its discretion in denying Gonzales's request for a DVPA restraining order against Oliva.

17

## IV

### *Grant of Oliva's Request for a DVPA Restraining Order*

Gonzales also claims the trial court abused its discretion in granting Oliva's request for a DVPA restraining order against him, arguing the trial court's findings are not supported by the record or the law. Not so.

Again, this is a judgment roll appeal that precludes Gonzales from challenging the sufficiency of the evidence to support the trial court's findings. As previously noted, the trial court found Gonzales to have "[i]ntentionally caused bodily injury" to Oliva, "[i]ntentionally or recklessly attempted to cause bodily injury" to Oliva, "[p]laced [Oliva] in reasonable apprehension of imminent serious bodily injury," and "engaged in conduct involving threats of violence," thereby causing "mental and emotional harm" to Oliva. We must conclusively presume the evidence adduced at trial supports these findings. Each finding provides an independent legal basis upon which the trial court could have issued the restraining order challenged by Gonzales. (See §§ 6203, subd. (a)(1), (3), (4), 6320; *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498 ["plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party"].)

This conclusion makes it unnecessary to address Gonzales's specific arguments, i.e., (1) the alleged vandalism incident was captured on surveillance video showing Gonzales was not the culprit, (2) trial testimony from Oliva and her former roommate regarding this incident should have been rejected by the trial court as physically impossible, (3) trial testimony from one of Oliva's friends, who apparently testified Gonzales pushed Oliva during a custody exchange in the sheriff's department parking lot, should have been rejected by the trial court as wholly improbable, (4) the trial court should not have considered Oliva's testimony regarding the alleged binoculars incident

18

because it was inadmissible hearsay and (5) Gonzales's admitted action of sending police to Oliva's residence to perform a welfare check does not constitute abuse as a matter of law.[2] Simply put, even assuming Gonzales is correct about the specific evidence identified in the first four arguments, we would still be required to conclusively presume the existence of other evidence supporting the trial court's findings. And while Gonzales's fifth argument presents a legal challenge, rather than an evidentiary one, the trial court found Gonzales intentionally caused bodily injury to Oliva, intentionally or recklessly attempted to cause such injury to Oliva, placed Oliva in reasonable apprehension of imminent serious bodily injury, and threatened violence, none of which was alleged to have happened *during the police welfare check*. Thus, even assuming Gonzales is correct such a welfare check may never constitute abuse under the DVPA, the findings of the trial court are more than sufficient to support issuance of the restraining order in this case and are independent of this welfare check.

On this record, we cannot conclude the trial court abused its discretion in granting Oliva's request for a DVPA restraining order against Gonzales.

---

**2**    Additional arguments made by Gonzales on appeal are forfeited because they are not raised under separate headings in the opening brief. Nor are they supported by reasoned argument and citation to applicable legal authority. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4 [an appellant must present each point separately in its opening brief, showing the nature of the question to be presented and the point to be made; failure to do so may be deemed a forfeiture of the argument]; *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [contentions not supported by reasoned argument and authority are forfeited].)

# V

## *Ineffective Assistance of Counsel*

Finally, Gonzales asserts reversal is required because he received ineffective assistance of counsel, i.e., his trial counsel "did not request a court reporter to be present, nor did [trial counsel] inform Gonzales that he had the option of requesting a court reporter or counsel him on the importance of preserving the record for appeal," and "also failed to object to the trial court's refusal to admit [certain] evidence" during trial. He is mistaken.

"[T]he general rule is that there is no due process right to counsel in civil cases. [Citation.] Generally speaking, the right to counsel has been recognized to exist only where the litigant may lose his [or her] physical liberty if he [or she] loses the litigation." (*Walker v. State Bar* (1989) 49 Cal.3d 1107, 1116.) In *Chevalier v. Dubin* (1980) 104 Cal.App.3d 975, a civil assault and battery case in which the jury awarded the plaintiff compensatory and punitive damages, the Court of Appeal rejected the defendant's claim of ineffective assistance of counsel, explaining, "we are aware of no authority, and counsel has cited us none, which would permit a trial or appellate court to grant a retrial to an unsuccessful litigant in a civil case, with or without punitive damages, on the grounds of incompetency of counsel." (*Id.* at p. 978; see also *In re Grunau* (2008) 169 Cal.App.4th 997, 1003 [unlike a criminal case, in which "a botched appeal may result in punishment for a crime of which the defendant was convicted in error, merely because his [or her] legal representative defaulted in the performance of his [or her] professional duties," in a civil case, "attorney negligence may be remediable by a malpractice action, and it may be better to relegate the aggrieved litigant to that remedy than to impair the finality of appellate judgments on the ground of counsel's deficient performance"].)

We therefore reject Gonzales's assertion reversal is required because he received ineffective assistance of counsel. "Indeed, the general rule is that attorney neglect in civil cases, if any, is imputed to the client." (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1575.)

DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                          /s/
                                    HOCH, J.


We concur:


          /s/
ROBIE, Acting P. J.


          /s/
DUARTE, J.